[No. B217290. Second Dist., Div. Seven. Dec. 21, 2009.]

ROMAN RAYMOND POLANSKI, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE et al., Real Parties in Interest.

508

510

**COUNSEL**

Manatt, Phelps & Phillips, Chad S. Hummel, Diana M. Kwok, Benjamin G. Shatz; Douglas Dalton; and Bart P. Dalton for Petitioner.

No appearance for Respondent.

Steve Cooley, District Attorney, Irene T. Wakabayashi, Phyllis C. Asayama and David Walgren, Deputy District Attorneys, for Real Party in Interest The People.

Silver & Field and Lawrence Silver for Real Party in Interest Samantha Geimer.

**OPINION**

**ZELON, J.**—In another chapter of what surely must be one of the longest running sagas in California criminal justice history, Roman Polanski, a fugitive since 1978, asked the trial court to exercise its discretionary authority to dismiss the criminal prosecution against him that has been pending since 1977. The trial court declined to consider Polanski's request until Polanski submitted to the court's jurisdiction by returning to the United States and appearing in court. Polanski asks this court to compel the trial court to

dismiss the action or, at least, to conduct an evidentiary hearing on Polanski's request. We conclude that the trial court did not abuse its discretion in applying the fugitive disentitlement doctrine and refusing to consider dismissing the action. In so doing, we do not disregard the extremely serious allegations of judicial and prosecutorial[1] misconduct that have been brought forward, but urge the parties to take steps to investigate and to respond to the claims.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Information Established by the Documentary Record, 1977–1978*

The limited documentary record of the proceedings in this case furnishes little insight into the serious issues presented by this matter. Roman Polanski was indicted by a grand jury in March 1977 on six counts: furnishing a controlled substance to a minor (Health & Saf. Code, § 11380, subd. (a)); a lewd or lascivious act on a child under the age of 14 (Pen. Code,[2] § 288[3]); unlawful sexual intercourse (§ 261.5[4]); rape by use of drugs (§ 261, subd. (3)[5]); perversion[6] (§ 288a, subds. (a), (c)); and sodomy (§ 286, subds. (a), (c)[7]). Polanski initially pleaded not guilty.

The district attorney's office agreed to a plea bargain with Polanski at the request of the family of the victim, Samantha Geimer,[8] who was 13 years old at the time of the offense. In light of Geimer's age and fears about the trauma that an extremely high profile trial would cause for her, Geimer's family, through counsel, advocated strongly for a plea bargain to protect her from further harm. On August 8, 1977, Polanski changed his plea from not guilty

---

[1] For clarity, we emphasize that all references to alleged prosecutorial misconduct in this opinion concern only the alleged conduct of former Deputy District Attorney David Wells as described by Wells in the interview he gave for the film Roman Polanski: Wanted and Desired (Antidote Films 2008). No allegation of misconduct has been leveled at former Deputy District Attorney Roger Gunson, the prosecutor responsible for Polanski's prosecution.

[2] Unless otherwise indicated, all further statutory references are to the Penal Code.

[3] This offense is now numbered as section 288, subdivision (a).

[4] This statute has been substantially revised since 1977. Were Polanski charged under the current statute, based on his age and the victim's age, he would presumably be charged under current section 261.5, subdivision (d).

[5] This offense is now numbered as section 261, subdivision (a)(3).

[6] This offense is now referred to as oral copulation, and the charged offense is now numbered as section 288a, subdivision (c)(1).

[7] This offense is now numbered as section 286, subdivision (c)(1).

[8] Although we customarily would not identify the victim of the offense by name in order to protect her privacy, Geimer has elected to relinquish what anonymity she had and to proceed under her own name both in public statements and in filings with this court. In light of her decision, we use her full name here.

to guilty on count 3, unlawful sexual intercourse. In the course of his plea, Polanski acknowledged that the trial court would determine whether he would receive a felony or misdemeanor sentence; that his punishment could range from probation, to up to one year in county jail, to 20 years in state prison; and that the judge would not determine Polanski's sentence until he had received a report from the probation department and heard the arguments of counsel.

The trial court then instituted mandatory proceedings to determine whether Polanski was a mentally disordered sex offender. The court appointed two psychiatrists to evaluate Polanski and set a further hearing for the mentally disordered sex offender hearing. The hearing was scheduled for September 19, 1977.

On September 19, 1977, the trial court conducted a hearing and determined that Polanski was not a mentally disordered sex offender. The court acknowledged that it had read and considered the probation report in the case and asked whether there was any legal cause why judgment should not be pronounced. Polanski's trial counsel, Douglas Dalton, answered that there was no legal cause why judgment should not be pronounced. The court invited Dalton to argue on sentencing, and Dalton argued that Polanski should be given probation as recommended by the probation department. Deputy District Attorney Roger Gunson argued that Polanski should receive time in custody.[9]

After identifying various considerations that the court would incorporate into its sentencing decision, the court stated, "This Court, i[n] sentencing the defendant, will do so upon the basis of fitting the punishment to the crime, yet at the same time weighing all of the circumstances surrounding the incident, including the defendant's background and lack of criminal record, and all factors in mitigation and aggravation of the offense. [¶] It is the judgment of this Court that the defendant be committed to the custody of the Department of Corrections at its prison facility in Chino, California, where he will be confined for a period of 90 days and undergo a diagnostic evaluation, pursuant to the provisions of [section] 1203.03 of the Penal Code. [¶] The purpose of the Court in ordering the in-depth diagnostic study is better to enable the Court to reach a fair and just decision as to the sentence to be finally or eventually imposed. [¶] The defendant will be returned here 90 days hence for further proceedings." Neither Polanski nor the People objected to the diagnostic study order. The court stayed the execution of the diagnostic study for 90 days to permit Polanski to complete a film he was directing, stating that the stay would "certainly" not extend past 90 days, "if it could be

---

[9] See discussion in Factual and Procedural Background part II.A., *post*, concerning allegations of events leading up to the hearing.

avoided." The diagnostic study, dated January 25, 1978, contained recommendations that Polanski be placed on probation.

On February 1, 1978, Polanski failed to appear in court for a scheduled sentencing hearing and a bench warrant was issued for his arrest.

Dalton filed a verified statement of disqualification for cause of the trial judge, Judge Laurence Rittenband, on February 14, 1978. On February 21, 1978, Judge Rittenband filed a verified answer to the disqualification statement in which he denied bias but consented to the transfer of the matter.

## II. Allegations of Judicial Misconduct Known to or Knowable by Polanski at the Time of His Flight

Here we diverge from the indisputable facts of what has gone before in this matter to allegations presented by Polanski in documents filed with the courts in 1978, 2008 and 2009 concerning events that occurred prior to Polanski's flight from the United States immediately before the February 1, 1978 sentencing hearing. These allegations—and they must be termed "allegations" because no court has ever held an evidentiary hearing and made factual findings concerning their veracity—are in many cases supported by considerable evidence, including declarations from both Prosecutor Gunson and Defense Counsel Dalton. Some of these allegations were disputed by Judge Rittenband in 1978 in his response to the disqualification papers Dalton filed, and this account of the preflight events is included below as well. To the extent that these allegations are true—and from the documentary evidence filed with this court, it appears to this court that there is a substantial probability that a court conducting an evidentiary hearing would conclude that many, if not all, are true—they demonstrate malfeasance, improper contact with the media concerning a pending case, and unethical conduct.

### A. Allegations of Judicial Misconduct at a Preorder In-chambers Meeting with Counsel, September 1977

Under penalty of perjury, Dalton and Gunson have both described an unreported in-chambers meeting among the trial judge, Dalton, Gunson, and probation officer Irwin Gold prior to the trial court's order referring Polanski for the diagnostic study. In a 1978 verified answer to the disqualification papers, the trial judge responded to some of the then aired allegations of judicial misconduct.

Douglas Dalton, 1978:[10] "On September 16, 1977, prior to ordering this very diagnostic study, Judge Rittenband stated to Deputy District Attorney Roger Gunson, Probation Officer Irwin Gold and defense counsel Douglas Dalton in his chambers that the diagnostic study at Chino would constitute the defendant Polanski's punishment and that there would be no further incarceration. (In fact, at the time of the September 16, 1977, meeting, he stated he expected a favorable report from Chino.) [¶] Deputy District Attorney Gunson and Probation Officer Gold had stated in this September 16, 1977, meeting that the use of a [section] 1203.03 study as punishment was an improper utilization of that provision. Nevertheless, the Judge stated that he would use this method of incarceration rather than the county jail because Polanski would be safer at Chino than in the county jail. Judge Rittenband stated that 60 days at Chino would be sufficient time in custody to constitute the defendant's punishment." Dalton further stated that "Judge Rittenband told defense counsel Dalton that at the hearing he should argue for probation, that Deputy District Attorney Gunson should argue for incarceration, and that then the Judge would order the diagnostic study pursuant to Section 1203.03 of the Penal Code."

Douglas Dalton, 2008: "Several days before September 19, 197[7], the date scheduled for the Probation Hearing and Sentencing, Judge La[u]rence Rittenband told Deputy District Attorney Roger Gunson, Deputy Probation Officer Irwin Gold, and me that he had already decided to send Mr. Polanski to prison for a 'diagnostic study' under section 1203.03 of the Penal Code as his complete punishment under the plea if the prison returned a favorable report and the press were not told of the agreement. [¶] Judge Rittenband neither sought nor listened to any opinions or recommendation of the parties present. Not only had the minor's family urged that Mr. Polanski not serve any time in prison, but the probation report also recommended a sentence of probation only." According to Dalton, "Deputy District Attorney Gunson and Deputy Probation Officer Gold both objected to the use of Penal Code section 1203.03 as punishment, stating that it was an improper and illegal use of the provision. Judge Rittenband disregarded their objections. Notwithstanding the fact that he had already made up his mind and pre-determined the result, Judge Rittenband directed Deputy District Attorney Gunson and me to engage in the charade of arguing our respective positions at the Probation and Sentencing Hearing on September 19, 197[7]."

Roger Gunson, 2009: "After Mr. Polanski's plea in August 1977, Judge Rittenband informed both Mr. Polanski's lawyer, Douglas Dalton, and me

---

[10] Dalton's 1978 statements are taken from his verified statement to disqualify Judge Rittenband for cause. While Gunson's 2009 declaration did not individually address Dalton's statements in that filing, Gunson did declare, "I reviewed that document [the statement of disqualification for cause] before it was filed and I agreed with it."

that Mr. Polanski would be sent to Chino State Prison under Penal Code section 1203.03 as his punishment. At that time, I told Judge Rittenband that the diagnostic study was not designed to be used as a sentence, but Judge Rittenband said that he was going to do it anyway."

Judge Rittenband: "I had a discussion in chambers with Dalton and Roger Gunson, the Deputy District Attorney, about possible sentences. I told them and the probation officer, who was present, that I would not follow the probation officer's recommendation for straight probation and that I felt time in custody was indicated. I indicated that I was concerned that Polanski might be the subject of an attack in the County Jail by other jail inmates who traditionally dislike child molesters and that I instead would commit Mr. Polanski to the state prison at Chino for a 90-day diagnostic study. At that time, I stated I wanted such a study to assist me in determining what sentence to impose on Polanski."

B. *Trial Court's Alleged Declaration of Decision to Impose Additional Punishment and to Require Polanski to Waive His Rights to Fight Subsequent Deportation; Alleged Refusal to Consider Evidence to be Adduced at Sentencing Hearing*

Douglas Dalton, 1978: "On or about January 30, 1978, Judge Rittenband met in his chambers with Deputy District Attorney Roger Gunson and defense counsel Douglas Dalton. Judge Rittenband stated that the diagnostic study from California Institution for Men, which recommended probation, was the worst he had ever seen and a complete whitewash of the defendant and that he had determined to send him back to prison." Dalton alleged that the trial court had hatched a plan to make the court look tough on Polanski, but with unpublicized relief coming later provided that Polanski left the country: "On January 30, 1978, at the meeting described in his chambers with Deputy District Attorney Gunson and defense counsel Dalton, Judge Rittenband had stated that he intended to send Polanski to state prison pursuant to Section 1168 of the Penal Code and then permit him to be released after the expiration of 48 days upon the condition that he would voluntarily agree to be deported from the United States. Section 1168 of the Penal Code would permit the Judge to retain his jurisdiction to modify the sentence within 120 days.[11] Deputy District Attorney Gunson and defense counsel Dalton had been told by the Judge that neither the Judge, Dalton, nor Gunson need explain to them (the newsmen) that Section 1168 of the Penal Code would permit the Judge to modify the sentence within 120 days, and tha[t] the sentence he would pronounce in open court would state only th[at] Polanski was sentenced to state prison for the term prescribed by law."

[11] The authority to recall a sentence within 120 days is now found at section 1170, subdivision (d).

According to Dalton, the parties reconvened in chambers the following day to meet again with the trial court. "Another meeting was held in chambers on January 31, . . . 1978, with Judge Rittenband and attended by Roger Gunson, Douglas Dalton, and Lawrence Silver, the attorney for the involved girl and her family. Discussions had taken place regarding the defense possibly having an evidentiary hearing in order to endeavor to change the current position of the Judge. Judge Rittenband expressed his then existing opinion that there was nothing which could be produced by the defense that would influence him regarding his intended sentence. Judge Rittenband further stated that he had not believed either Polanski or DeLaurentiis at the evidentiary hearing regarding the Munich trip[12] and that DeLaurentiis was 'so slick' and only giving his testimony to try to help his friend for which he did not blame him. The Judge further stated that he would not permit any additional time for the defense to decide whether or not they wanted such a hearing or to prepare for the hearing prior to sentencing despite repeated requests by Dalton for more time for this purpose. Deputy District Attorney Gunson stated that if Judge Rittenband wanted to give Polanski 48 more days in custody that he should sentence him to 90 days in the county jail and give him credit for the 42 days which Polanski had served while undergoing the diagnostic study at Chino. Judge Rittenband stated that the appearance of a state prison sentence must be maintained for the press and for this reason he would not consider any county jail sentence."

Dalton alleged that he told the court "that he needed additional time to consult with his client regarding the evidentiary hearing. Judge Rittenband stated that the press expected a hearing on the following day and that they were going to have one. During these conversations, Judge Rittenband took a telephone call which he identified as being from Bill Farr[,] a reporter for the Los Angeles Times[,] and stated that he advised Farr that the hearing was going forward on the following day. The Judge further stated that at the hearing on the following day, February 1, 1978, that Dalton should vigorously argue for no further incarceration and that Gunson should then argue against probation and for a sentence of incarceration. Following the arguments of counsel, the judge would make his own statement and the state prison sentence would be imposed. Gunson pointed out that the question of

---

[12] There are allegations in the record that during the stay of the diagnostic study that was granted by the trial court to permit Polanski to direct a movie in Europe, a published photograph depicting Polanski at Oktoberfest in Munich prompted the judge to become concerned about Polanski's overseas activities and to conduct a two-day hearing in October 1977 for the purpose of determining whether the stay should be dissolved. At that hearing, Polanski allegedly testified that he was in Munich on a business matter relating to the film, and the movie's producer, Dino DeLaurentiis, allegedly corroborated Polanski's account. Neither a transcript of this hearing nor any order relating to it appears in the record. Further discussion of events that are alleged to have led up to the hearing may be found at part II.C. of the Factual and Procedural Background, *post*.

the hearing should be resolved before the Judge imposed a sentence. Judge Rittenband stated that he would, nevertheless, make his remarks and impose the sentence and that if Dalton and his client Polanski still wanted a hearing that they could have one within ten days in the form of a motion for a new trial. (This, of course, meant that the hearing would follow the statement of the Judge and the imposition of the sentence that then would be known to the press and the public.) In addition, Judge Rittenband told defense counsel Dalton that if he conducted the hearing at a motion for a new trial there would be no assurance that Polanski would be released in 48 days upon the conditions the Judge had previously outlined, i.e., the voluntary agreement to deportation. Judge Rittenband further stated that if the defense decided not to hav[e] such a hearing they would be permitted to withdraw the motion fo[r] a new trial and Polanski would be committed to the state prison and the agreement about the 48 days would still be in effect."

According to Dalton, he and Gunson each resolved not to participate in the charade ordered by the trial court: "Following the meeting with the Judge, Deputy District Attorney Gunson, defense counsel Dalton and attorney Silver discussed what had occurred at the meeting with the Judge in chambers, and both Gunson and Dalton stated that they would not permit themselves to act out the roles assigned to them by the Judge in such a staged proceeding which was for the benefit of the press and with the result already pre-determined by the Judge."

Douglas Dalton, 2008: After Polanski submitted to the diagnostic study ordered by the trial court, "Judge Rittenband reneged on his promise that Mr. Polanski would serve no further time in custody, giving as his sole reason that he had been the subject of 'criticism.' The Judge never identified the source or nature of the 'criticism,' and no such 'criticism' appeared in the probation report or diagnostic study, which both recommended probation for Mr. Polanski." Dalton alleged that "Judge Rittenband announced to counsel that he now intended to send Mr. Polanski to prison for the second time under the following conditions: (1) that he serve 48 additional days in prison; (2) that he would not be permitted to have a hearing on this additional sentence; (3) that he agree to waive his rights to a deportation hearing and agree to 'voluntarily deport himself;' and (4) that no hearing would be permitted until after the imposition of the prison sentence and that even more serious consequences could be expected if a hearing were held. [¶] At no time did the assigned prosecutor, Deputy District Attorney Gunson, request any of the above conditions. Both Deputy District Attorney Gunson and I objected to Judge Rittenband's denial of Mr. Polanski's right to a hearing prior to sentencing. However, Judge Rittenband summarily rejected our arguments without any suggestion of legal authority to support the sentence and

conditions that he intended to impose. The Judge also instructed Mr. Gunson and me to argue as though we were unaware of his intentions, and not to expose this information to the press."

Roger Gunson, 2009: "After Mr. Polanski's release from Chino, Judge Rittenband told Mr. Dalton and me that he intended to impose a further term of incarceration upon Mr. Polan[sk]i."

Judge Rittenband, 1978: "On or about January 27, the court received the diagnostic study and recommendation by the California Department of Corrections at Chino. Mr. Polanski, having returned to Los Angeles, was supposed to report on Monday, January 30. On January 30, Mr. Dalton and Mr. Gunson came to my chambers to discuss the report. I told them that I had carefully read it and that I felt it was superficial, replete with many inaccuracies and factually unsupported conclusions, and was conspicuous more for what it failed to report than what it did report. I believe I used the word 'whitewash'. I stated that there was absolutely no mention in the report of any discussions which the counsellors [sic] and psychiatrists at Chino had with Mr. Polanski relating to the serious and aggravated charges of rape by drugs and alcohol, sodomy, and oral copulation of the 13-year-old victim. I believe I pointed out to them that a statement in the report 'that throughout the experience (with the victim) Mr. Polanski seems to have been unaware that he was involving himself in a criminal offense, an isolated instance of naivete, unusual in a mature sophisticated man', was one of the most fatuous statements in a diagnostic report that I have ever read. I told Mr. Dalton that I did not propose to follow the recommendations which were for straight probation without any additional time in custody. [¶] I then stated that an appropriate sentence would be for Mr. Polanski to serve out the remainder of the 90-day period for which he had been sent to Chino, provided Mr. Polanski were to be deported by the Immigration and Naturalization Bureau, by stipulation or otherwise, at the end of the 90 days. I expressly stated that I was aware that the court lacked authority to order Mr. Polanski deported directly or as a condition of probation. However, based on the facts before me, I believed that the safety and welfare of the citizens of California required that Mr. Polanski be kept out of circulation for more than 90 days. However, since Mr. Polanski is an alien who had pleaded guilty to an act of moral turpitude, I believe that the interests of the citizens of California could be adequately safeguarded by a shorter jail term if Mr. Polanski would thereafter absent himself from the country."

C. *Allegations of Judicial Preoccupation with Public Response Concerning the Stay and Judicial Statements to the Press While the Case Was Pending*

Douglas Dalton, 1978: Dalton alleged that as early as June 1977, the trial court was speaking to the press about the pending Polanski case. "In the June 6, 1977, issue of People magazine, the Judge was quoted as saying, 'I've handled other celebrity cases and this just doesn't look like anything other than a routine rape case to me.' When asked if the defendant would be able to receive a fair trial in Los Angeles, Judge Rittenband replied: [¶] 'People here are more sophisticated than anywhere else in the country and from what I've been able to gather, public opinion is divided on who is at fault. There are those who think Polanski a devil, and others who wonder why a mother would let her 13-year old daughter go around with a 43-year old film director anyway.' "

Dalton asserted that after a photograph of Polanski at Oktoberfest in Munich appeared in a newspaper in late September 1977, "Judge Rittenband expressed great consternation to Deputy District Attorney Gunson and defense counsel Dalton over the appearance of this article and the criticism it engendered of him, and he advised them both tha[t] he wanted defendant Polanski immediately to return to court." Dalton alleged that the trial court gave an interview to the Herald Examiner newspaper in which he stated that Polanski could be on his way to prison that weekend.[13] According to Dalton's representation of the contents of the newspaper article, the trial court stated in the interview, "I didn't know then (at the time of granting [the] stay) that the picture would be impossible to finish in 90 days," and "I do feel that I have very possibly been imposed upon."[14]

Although the transcript of this hearing is not in the record, it appears not to be disputed that the trial court convened a hearing concerning whether Polanski's visit to Munich was in connection with a business matter and whether the stay should be dissolved. Dalton alleged in 1978 that prior to that

---

[13] Dalton's 1978 statement of disqualification stated that the interview was attached as an exhibit, but the interview was not provided to this court.

[14] This alleged statement by the trial court was contradicted by information established by the documentary record to have been provided to the trial court: (1) Gunson's opposition to the stay at the September 19, 1977 hearing, in which Gunson had argued that a 90-day stay was insufficient to permit Polanski to finish the movie, which could take a year to complete; and (2) the probation report, which included producer Dino DeLaurentiis's assessment that the production was "extremely difficult" and likely to involve Polanski for "at least the next 12 months."

hearing, the trial court "advised Gunson and Dalton that he had been criticized in the press and by others for his action in granting the stay in the first place, and that he would not under any circumstances grant any additional stays."

Douglas Dalton, 2008: After "a picture of Mr. Polanski appeared in the Santa Monica Evening Outlook Newspaper carrying a false caption that Mr. Polanski had 'popped over to Munich for rest and relaxation,' " the trial court indicated an intent to dissolve the stay on the diagnostic study. "In an interview with Marilyn Beck of the Herald Examiner, Judge Rittenband stated that Mr. Polanski 'could be on his way to prison by the weekend.' "

Judge Rittenband, 1978: "At no time was I swayed by public clamor or considerations of personal popularity or by apprehension of unjust criticism."

### D. Allegations of Ex Parte Communications and Consideration of Matters Outside the Record

In the 1978 verified statement of disqualification for cause, Dalton alleged that "On several occasions in the presence of Gunson and Dalton, Judge Rittenband has referred to mail which he has received criticizing him for granting the stay to Polanski to work on the film; for permitting Polanski to go to Europe; and for ordering the diagnostic study. Judge Rittenband indicated he read these letters and was concerned about them." Dalton believed that a file of these letters was maintained in Judge Rittenband's department and stated that he would ask at the hearing that the file be marked as an exhibit to the statement of disqualification. According to Dalton, "Both Deputy District Attorney Gunson and defense counsel Dalton have stated to the Judge that it was improper to consider such ex parte communications."

Furthermore, Dalton alleged that "[p]rior to the defendant's commitment to Chino for the diagnostic study, Judge Rittenband advised counsel for the defense and for the prosecution that he had heard from a friend of his that there had been an article in a London newspaper approximately eight to ten years ago stating that Polanski had been involved in a similar incident with a minor female in London and had been forced to leave that country because of the occurrence. Gunson was told by Judge Rittenband to look into the matter. Thereafter he reported back to Judge Rittenband that he had found no factual record to support that such an event had occurred. Dalton stated his client denied that any such event had occurred[.] Judge Rittenband made a phone call to his friend in the presence of both Dalton and Gunson and said that the person still insiste[d] such an article had appeared in a London paper. Counsel for the defendant complained that it was improper for the Judge to consider such reports outside the record."

Dalton also alleged that on another occasion, the trial court "stated to Roger Gunson and Douglas Dalton that he believed that one Henri Sera had put Polanski in touch with the girl involved in the present case for the specific purpose of Polanski having a sexual contact with her. Gunson advised the Judge that his office had thoroughly investigated that possibility, and their investigation had concluded that there was nothing to substantiate that Henri Sera contacted the family or the girl so that Polanski could have sexual relations with her. Despite this assertion by the District Attorney Gunson, on or about January 30,[] 1978, in a conference in chambers, Judge Rittenband stated to Roger Gunson and Douglas Dalton that he still believed that Sera had made arrangements for Polanski so that the defendant could have a sexual relationship with the girl."

### III. Alleged Conduct After Flight, Prior to Statement of Disqualification

Dalton alleged that within days after Polanski's flight, Judge Rittenband held a press conference. Dalton asserted that the judge discussed the in-chambers meetings he had with counsel and disclosed that he "had told the attorneys that his intention at that time was to sentence the defendant to state prison and release him in 48 days if he agreed to voluntary deportation."

According to Dalton, at the news conference on February 6, 1978, Judge Rittenband stated, "I'm not unhappy he's out of the country. His conduct in this case is such that it would warrant his leaving the country." Dalton further alleged that the judge said, "I then discussed with them [counsel] what I might do, and among that was the—my thought that I would see that Mr. Polanski spend additional time in prison. The length of time, of course, would depend on whether or not there would be a deportation or if not deported involuntarily he would agree with the Director of Immigration to consent in writing to leaving the country in which case any balance of his stay in prison would be cut short."

### IV. Polanski's Subsequent Opportunity to Return Without Further Incarceration

Douglas Dalton, 2008: "[S]ometime in 1997, I requested that Mr. Gunson appear in Department 100, the presiding criminal department, so I could request assignment of the *Polanski* case to a new judge to discuss a potential resolution of the matter. The case was assigned to Superior Court Judge Larry Fidler. Mr. Gunson and I were given the court file which we took to Judge Fidler's courtroom. Nothing was said to us that any part of the court file, was missing. Judge Fidler recognized both of us and invited us into his chambers. No court reporter or stenographer was present at the ensuing meetings

between Judge Fidler, Mr. Gunson, and me that followed over the next several weeks. I explained to Judge Fidler my purpose in requesting the meeting, and he stated that he had some recollection of the case from 1977 and the problems regarding Judge Rittenband. Judge Fidler agreed to take the case, even though he could easily have declined to accept handling what he knew to be a controversial matter in which he could expect criticism."

Dalton stated, "Judge Fidler made no representation of what he would have done had he handled the case originally, but only that he believed that a commitment made by a Judge of the Court should be fulfilled. Thus, after several meetings and a full review of the factual material, Judge Fidler stated that he would honor the agreement made by Judge Rittenband that the period of incarceration for Mr. Polanski while undergoing the diagnostic study would constitute the full and complete punishment. [¶] After considering the materials we submitted and after discussions with Mr. Gunson and me, Judge Fidler advised us that, if Mr. Polanski returned to Los Angeles, he would allow Mr. Polanski to be booked and immediately released on bail, require Mr. Polanski to meet with the probation department, order a probation report, conduct a hearing, and terminate probation without Mr. Polanski having to serve any additional time in custody."

Dalton continued, "Judge Fidler stated that due to the widespread public interest in the case and the lack of awareness regarding what had occurred in 1978, the sentencing proceedings should be televised in order that wide public coverage could be afforded for the benefit of the public understanding." Dalton consulted with Polanski and Polanski's agent. According to Dalton, the prospect of televising the proceedings was a deal breaker, and Polanski elected not to return to the United States even with this assurance of no incarceration: "Given the prospect of another huge media event and the changed personal circumstances of Mr. Polanski, which included a stable marriage and two young children, it was Mr. Polanski's decision not to resurrect this 20-year old case at that time for another worldwide televised media event."

V. *Evidence of Misconduct by a Member of the District Attorney's Office Revealed After Polanski's Flight*

The film Roman Polanski: Wanted and Desired, released in 2008, contained interviews from a number of persons involved in the Polanski case, including Dalton and Gunson. It also featured excerpts from an interview with a former deputy district attorney named David Wells. Wells claimed he had initially handled the case for the district attorney's office but that the case

was taken from him because he "was too close to the investigation" and had become a potential witness by engaging in conversations with Polanski.[15]

In an interview with the filmmakers, Wells described himself as disappointed that the Polanski case was taken from him. "I wanted to try that case because all of us like some measure of publicity, and this is the way you get it in the D.A.'s office, trying major cases or publicity cases."

Although Wells was not the prosecutor on the Polanski matter, he claimed to have been "privy to almost everything that went on in that case[,] being assigned to that court as the calendar deputy. I was in the court every day. So Rittenband'd ask me questions about the thing because he counted on me, or whoever his favorite D.A. was at the time, to advise him on what the—what the law was, criminal law. He was very good at civil law, but criminally, he left that to his D.A.s to—to do." He described Judge Rittenband as saying to him, " 'Look, I don't know anything about criminal law, don't want to know. Just don't get me reversed on appeal. You do whatever you want to do, just don't get me reversed.' That was his theory." Wells claimed to have been "as good [a friend with Judge Rittenband] as anybody can be," even discussing the judge's girlfriends with him. Wells said that he used to "kid with him a lot. He took me to Hillcrest [Country Club] for lunch every once in a[]while. And in that respect I knew him and I could talk to him."

According to Wells, he was not involved with Polanski's plea, but he felt strongly about it: "I know I was very miffed the way it turned out because my feeling was the guy belonged in state prison." Wells was "pretty vocal about that," to the point where he "was told by the [district attorney's] office, 'It's not your case anymore.' " Wells described himself as feeling that Polanski's offense was "reprehensible and I felt that he should have gone to state prison, and I would have insisted on a state prison sentence."

Wells described ex parte communications he had with Judge Rittenband while the matter was pending before him. "Rittenband had asked me about it. And I said, 'Judge,' I said, 'You know, you're gonna give this guy probation.' [¶] He said, 'No, no. I wanna send him to jail.' [¶] I said, 'You'll never do it because the first thing that's gonna happen when you sentence him, he's gonna appeal it. And it's gonna go all the way up to the State Supreme Court—he has the money—and he'll take it to the U.S. Supreme Court, if he thinks he can."

---

[15] The court has viewed the film, which was submitted as part of the record. Statements attributed to David Wells were taken from the transcript of the interview with Wells that was submitted with this portion of the record. Not all the statements set forth herein appeared in the film.

Wells claimed to have been the architect of the plan to use a diagnostic study referral as a nonappealable punishment. According to Wells, Judge Rittenband asked, " 'Well what am I gonna do'—or 'What should I do?' " Wells allegedly responded, "And I said, 'You know what you should do is send him up for a 90-day observation because that's probably more time than you're gonna give him anyway because you're a softy on sentencing.' " Wells reported that the court asked, " 'Well what will that do?' [¶] And I said, 'It's not a final sentence. You can't appeal it. He has to go.' " Wells said, "And so that's what Rittenband did. He made his own decision up, but, you know, I told him it's not a final sentence."

Wells also claimed in the interview to have called the court's attention to the photograph of Polanski in Munich and to have characterized it as a direct insult to Judge Rittenband: "I took it in to Rittenband because I figured it was something he ought to see. [¶] And what I told him was, I said, 'You know, Judge, you've made so many mistakes, I think, in this case. Look at [this]. He's giving you the finger. He's flipping you off. And here's the way he's doing it.' And I said, 'Haven't you had enough of this?' " According to Wells, the court responded, " 'What? What?' " and " 'He's not gettin' away with that.' " Wells said, "And then, of course, then he exploded, what happened happened." Wells drew a distinction between provoking Judge Rittenband with the Polanski photograph and "sitting down and talking about sentencing on a case or the trial tactics, which would be unethical," although he thought that, "In retrospect, it would have probably been better to let it sit because I'd be waiting like a big spider or Rittenband would, and if he saw the picture and Roman Polanski didn't know about it and he slammed him with a sentence, he'd be in trouble."

Both Gunson and Dalton have denied, in written statements made under penalty of perjury, any knowledge of these alleged ex parte contacts between Wells and the trial judge at the time that they allegedly occurred. Counsel for Polanski has also communicated to this court that Wells has since "in part recanted" his statements but this is not established by the record supplied to this court.

VI. *Legal Proceedings Subsequent to Film Revelations*

In late 2008, Polanski's counsel filed a request in Department 100, before Judge Peter Espinoza, asking that the trial court, on its own motion, dismiss the action against Polanski in furtherance of justice. That request was based on the allegations of judicial misconduct that had been known to Polanski in 1977 and 1978; on Wells's revelations in the film; on allegations that the district attorney's office and the court committed misconduct in 2008 when they denied, in response to the Polanski film, that Judge Fidler had insisted in

1997 negotiations that the proceedings would be televised if Polanski returned; and on Geimer's expressed wishes that the matter be concluded. Geimer filed a declaration and requested the court to dismiss the action.

In January 2009, Polanski's counsel filed a verified statement of disqualification seeking to disqualify the entire Los Angeles Superior Court from hearing the Polanski matter, in which counsel alleged that one judge (Judge Fidler) had personal knowledge of disputed evidentiary facts in the case; that the court's public information office had expressed the court's predetermination of issues before the court; and that the court was biased against Polanski's counsel. This statement was stricken on the ground that it demonstrated on its face no legal basis for disqualification.

On February 17, 2009, the trial court heard argument and issued its written order. The court ruled that Polanski must be present at any proceeding regarding his case, pursuant to the outstanding bench warrant and section 977, and it also concluded that under the fugitive disentitlement doctrine, Polanski was not entitled to request affirmative relief from the court while he remained at large. The trial court extensively discussed the policy considerations underlying the fugitive disentitlement doctrine and their application in the context of the Polanski matter, and relied on principles of enforceability, deterrence, encouragement of surrender, the protection of the court's dignity, attempts to gain an advantage over the court, and delay. It concluded that Polanski forfeited his right to approach the court for affirmative relief by remaining outside the jurisdiction of the court. Expressly stating that it did not reach the substantive merits of Polanski's claims, the court denied what it called "the motion to dismiss" without prejudice, but stayed the order to permit Polanski to return and submit to the court's jurisdiction. The court orally granted a stay of the order until May 7, 2009. On May 4, 2009, Polanski's counsel advised the trial court that Polanski would not appear at the hearing set for May 7. The court, on May 7, ordered that its previously stayed order take immediate and full effect.

On July 7, 2009, Polanski's counsel filed a petition for writ of mandate in this court, asking as principal relief that we compel the trial court to dismiss the action. On July 8, 2009, this court requested that the People serve and file opposition to the writ petition on or before July 24, 2009. We received the requested opposition on July 24; on July 30, 2009, this court issued an order to show cause why the trial court should not be compelled to vacate its orders and to set the matter for an evidentiary hearing, without requiring Polanski to be present, to determine whether the case should be dismissed in furtherance of justice.

After briefing was completed but before the matter was set for oral argument, it came to the court's attention that Polanski had been arrested in

Switzerland in connection with the pending criminal action. Polanski's counsel soon thereafter asked for expedited oral argument in this matter because Polanski had been apprehended, while the district attorney's office advocated dismissing the writ proceeding as moot for the same reason. We requested and received supplemental briefing on the People's assertion that Polanski's anticipated plan to oppose extradition constitutes a forfeiture of the right to request relief from this court. This court also received Geimer's request to this court to dismiss the matter for the purpose of finality and to end the disruption, trauma, and personal invasion that she suffers whenever public interest resurges in the case.

## DISCUSSION

### I. *Standing*

The People contend that this petition should be dismissed because Polanski lacks standing to bring it. The People begin with the language of section 1385, which confers authority to move to dismiss an action in the interest of justice upon two parties, the trial court and the prosecutor. It is well established that "a defendant does not have a right formally to make a motion before a magistrate [or judge] to dismiss a complaint in furtherance of justice under section 1385. By its terms, section 1385 provides for the magistrate [or judge] to exercise his or her authority to dismiss on this basis only on 'his or her own motion or upon the application of the prosecuting attorney.' (§ 1385, subd. (a).) It is settled, however, that a defendant may 'informally suggest' that the magistrate [or judge] consider dismissal on the magistrate's [or judge's] own motion. (*People v. Smith* (1975) 53 Cal.App.3d 655, 657 [126 Cal.Rptr. 195] [with reference to a trial court]; accord, *People v. Superior Court (Flores)* (1989) 214 Cal.App.3d 127, 137 [262 Cal.Rptr. 576] [same]; see *Rockwell v. Superior Court* (1976) 18 Cal.3d 420, 441–442 [134 Cal.Rptr. 650, 556 P.2d 1101] [same].)" (*People v. Konow* (2004) 32 Cal.4th 995, 1022 [12 Cal.Rptr.3d 301, 88 P.3d 36], fn. omitted.)

 The People acknowledge that the defendant in a criminal matter has the authority to ask the trial court to consider dismissal in the furtherance of justice and that the court must entertain the request. Indeed, they cite the decision in *People v. Carmony* (2004) 33 Cal.4th 367 [14 Cal.Rptr.3d 880, 92 P.3d 369] (*Carmony*), which provides, "A defendant has no right to make a motion, and the trial court has no obligation to make a ruling, under section 1385. But he or she does have the right to 'invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading, and the court must consider evidence offered by the defendant in support of his assertion that the dismissal would be in furtherance of justice.' [Citation.] And '[w]hen the balance falls clearly in favor of the defendant, a

trial court not only may *but should* exercise the powers granted to him by the Legislature and grant a dismissal in the interests of justice.' [Citation.]" (*Id.* at p. 375.) In *Carmony*, moreover, the Supreme Court held that "the defendant's inability to move to dismiss under section 1385 should not . . . preclude him or her from raising the erroneous failure to do so on appeal." (*Id.* at p. 376 [holding that a defendant may appeal the decision not to dismiss a prior conviction under § 1385].) Although we are here considering a petition for writ relief rather than an appeal, the People have not offered, nor do we discern, any principled basis under section 1385 for distinguishing between the two forms of appellate relief. Based on *Carmony*, we identify no impediment to appellate review of the trial court's ruling on Polanski's invitation, whether it is termed a motion or an informal request, to the trial court to dismiss the matter. The People's contention that "[b]ecause he lacked standing to bring the motion, there are no arguable issues on appellate review before this Court and the Petition should be dismissed; he cannot seek appellate review of a motion he could not bring in the first place," contravenes the holding of *Carmony* and is not meritorious.[16]

The People contend, however, that if the limitation on who may seek dismissal under section 1385 "is to have any meaning at all, it must apply to this defendant who is a fugitive . . . ." Conflating standing and equitable disentitlement, the People seek to bootstrap the concept of fugitive disentitlement to the idea of no defense standing from the language of section 1385 and conclude that "the concept of requiring a court to dismiss a case [on] its own motion *in the furtherance of justice* cannot be reconciled with a fugitive who flouts the authority of that same court." If we properly understand the

---

[16] The People's reliance on the pre-*Carmony* decision in *People v. Gillispie* (1997) 60 Cal.App.4th 429 [70 Cal.Rptr.2d 462], does not convince us otherwise. The People quote from a small portion of a footnote in that decision, but a reading of the full footnote indicates that this is the court's explanation in dicta of how it understands dicta contained in an earlier decision in *People v. Benson* (1976) 64 Cal.App.3d Supp. 10 [134 Cal.Rptr. 766]. (*Gillispie*, at p. 433, fn. 2.) The *Gillispie* court considered whether a defendant may appeal the denial of relief under section 1385, and over the People's argument that a defendant lacked standing to raise the issue, the court concluded that on appeal, a defendant may assert a claimed error in the court's refusal to strike a prior conviction. (*People v. Gillispie*, at p. 433.) The court wrote, "The People argue that a defendant has no standing to complain of the manner in which the trial court exercises its discretion to deny such relief under Penal Code section 1385. They reason that a defendant cannot complain of an order denying that which he had no right to request. In our opinion, however, the People erroneously analyze the issue of standing." (*Ibid.*, fn. omitted.)

People's claim, they assert both that Polanski lacks the authority to informally request the court to dismiss his case until he returns to the jurisdiction, and that we lack the authority to review any trial court decision on such an informal request.[17]

Although presented as a section 1385 standing argument, this contention is at its core an argument for the application of the equitable doctrine of fugitive disentitlement. The People have not, nor have we, identified any authority making an exception for fugitives to the Supreme Court's ruling in *Carmony* that a trial court's section 1385 determination is reviewable. (*Carmony, supra*, 33 Cal.4th at p. 376.) We do not hold that a trial or appellate court is barred from considering a defendant's fugitive status in considering a section 1385 request or an appeal or writ therefrom; we simply observe that nothing in section 1385 or its interpretive decisional law precludes this court from considering the instant petition. As far as fugitive disentitlement, which shall be discussed in far greater depth below, the doctrine remains an equitable one, and we are aware of no authority compelling any court to disentitle a fugitive defendant by determining that he lacks standing for the purposes of seeking appellate review of a court's decision under section 1385.

## II. *Mootness/Appellate Disentitlement*

The People, by letter filed October 9, 2009, have advocated that we dismiss Polanski's petition for writ of mandate on mootness grounds. According to the People, because the sole issue presented in this matter, as set forth in the order to show cause, was whether the trial court should be compelled to order an evidentiary hearing without requiring Polanski to be physically present, the arrest of Polanski and the pending extradition proceedings have mooted the issue. If Polanski does not fight extradition, the People argue, then his physical presence will promptly be secured and he may make a section 1385 request in person. If he fights extradition, then by this conduct he forfeits the right to invoke the jurisdiction of the court.

■ "A case becomes moot when a court ruling can have no practical impact or cannot provide the parties with effective relief." (*Simi Corp. v. Garamendi* (2003) 109 Cal.App.4th 1496, 1503 [1 Cal.Rptr.3d 207].) We do not agree that Polanski's arrest and detention moot this case. We do not know whether Polanski will in fact be extradited and are given to understand that he is at present fighting extradition. Polanski's recent apprehension in Switzerland could potentially result in mooting the issue of a hearing in his absence: Polanski could appear in a California court at some point, either

---

[17] The People write, "Should Petitioner decide to submit to the jurisdiction of the superior court, he would have the right to request the court to dismiss his case, the court would be required to exercise its discretion, and the exercise of that discretion then would be reviewable."

because he assents to extradition or because his opposition proves unsuccessful. But even before Polanski was detained, the possibility, albeit remote, that Polanski could appear in court existed, and the existence of that possibility did not moot the issue. Certainly the arrest in Switzerland significantly increased the possibility that Polanski would appear in the superior court, but in the absence of actual extradition, we cannot say that the question of Polanski's entitlement to a hearing in his absence has been rendered moot. Polanski is still not here and shows no signs of appearing anytime soon, so the question of whether he is entitled to relief from afar has not been rendered " 'abstract or academic' " by subsequent events, nor is there any indication that a decision in Polanski's favor would now be "without practical effect." (*People v. Herrera* (2006) 136 Cal.App.4th 1191, 1198 [39 Cal.Rptr.3d 578].)

■ Although the People characterize their argument as concerning mootness, in fact they advocate appellate application of the fugitive disentitlement doctrine. As the People put it, "It was an affront to the authority of this Court and of the superior court for Petitioner to say that he should not have to voluntarily get on a plane and surrender himself to this Court's jurisdiction in order to have his dismissal motion heard; it is an even more egregious affront and a waiver of the issue presented, to *affirmatively fight* return to the jurisdiction of this Court while seeking relief from it at the same time." While there is no constitutional bar to forcing a fugitive to decide between fighting extradition and obtaining legal benefits that are denied to fugitives (see *U.S. v. Catino* (2d Cir. 1984) 735 F.2d 718, 723 [not unconstitutional to require a defendant to choose between fighting extradition and gaining the benefit of the statute of limitations]), Polanski's resistance to extradition does not automatically "disentitle" us from considering his petition. (*U.S. v. Gonzalez* (9th Cir. 2002) 300 F.3d 1048, 1051 [because fugitive disentitlement "is an equitable doctrine, application is discretionary"].) Because of the very serious allegations of judicial and prosecutorial misconduct raised by Polanski in this matter and their implications for the integrity of the criminal justice system, we decline the People's request to apply the disentitlement doctrine to Polanski's petition for writ of mandate and instead consider it on its merits. (See *Eisler v. United States* (1949) 338 U.S. 189, 196 [93 L.Ed. 1897, 69 S.Ct. 1453] (dis. opn. of Jackson, J.) (*Eisler*) ["I do not think we can run away from the case just because Eisler has."].)

III. *Timeliness*

The People next argue that this petition should be dismissed because it was filed 61 days after the date that the trial court's ruling became final. While conceding that "a one-day delay by itself is not significant," the People argue that the delay was unreasonable and unjustified, warranting dismissal. "A

filing period of 60 days is typically recognized, but a petition filed after 60 days will not be denied unless the respondent can show prejudice. [Citations.]" (*Good v. Superior Court* (2008) 158 Cal.App.4th 1494, 1505, fn. 9 [71 Cal.Rptr.3d 125].) We decline to dismiss the petition on timeliness grounds because the People have not identified any prejudice from the filing of this writ petition on July 7, 2009, rather than on July 6, 2009; because the delay in filing the petition was truly minimal; and because any court interest in holding fast to the timeliness principle against a nonprejudicial one-day incursion is far outweighed by the interest in considering the grave judicial and prosecutorial misconduct alleged here.

### IV. *The Trial Court Did Not Abuse Its Discretion When It Ruled That Polanski Was Subject to the Fugitive Disentitlement Doctrine*

### A. *The Fugitive Disentitlement Doctrine: History and Policies*

"That the court, independent of statutory authority, has power to dismiss the appeal of an appellant who is a fugitive from justice has long been accepted as a proper exercise of the jurisdiction of the appellate courts of this state." (*People v. Clark* (1927) 201 Cal. 474, 477 [259 P. 47].) The fugitive disentitlement doctrine dates back to 1880 in California with *People v. Redinger* (1880) 55 Cal. 290 (*Redinger*), in which the Supreme Court dismissed an escaped defendant's appeal because "[i]t would be a farce to proceed in a criminal cause, unless the Court had control over the person charged, so that its judgment might be made effective." (*Id.* at p. 298.) The California disentitlement doctrine is frequently explained in these terms: "A party to an action cannot, with right or reason, ask the aid and assistance of a court in hearing his demands while he stands in an attitude of contempt to legal orders and processes of the courts of this state." (*MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277 [89 P.2d 382].)

The disentitlement doctrine is equally venerable on the federal level. In 1876, in *Smith v. United States* (1876) 94 U.S. 97 [24 L.Ed. 32], the United States Supreme Court declared, "It is clearly within our discretion to refuse to hear a criminal case in error, unless the convicted party, suing out the writ, is where he can be made to respond to any judgment we may render." (*Id.* at p. 97.) The defendant's escape "does not strip the case of its character as an adjudicable case or controversy," but "it disentitles the defendant to call upon the resources of the Court for determination of his claims." (*Molinaro v. New Jersey* (1970) 396 U.S. 365, 366 [24 L.Ed.2d 586, 90 S.Ct. 498].)

A variety of justifications have been advanced in support of the fugitive disentitlement rule. One, of course, is enforceability. "[S]o long as the party cannot be found, the judgment on review may be impossible to enforce."

*(Degen v. United States* (1996) 517 U.S. 820, 824 [135 L.Ed.2d 102, 116 S.Ct. 1777] *(Degen)*, superseded in the civil forfeiture context by 28 U.S.C. § 2466; see also *Redinger, supra*, 55 Cal. at p. 298.) Another is a sense of unclean hands: the "abstract principle that a fugitive *forfeits* the right to invoke the jurisdiction of the courts to review a judgment that the fugitive flouts. [Citations.]" *(People v. Kubby* (2002) 97 Cal.App.4th 619, 623 [118 Cal.Rptr.2d 588] *(Kubby).*)

Courts have also grounded the disentitlement doctrine in the affront to the justice system arising from a fugitive's appropriation to himself or herself of the power to dictate the ultimate result of the criminal proceedings. One California court has articulated this concern as follows: "Defendant's flight from the court's jurisdiction makes a mockery of the justice system because it places the misdemeanant, rather than the courts, in the position of determining whether to submit to the court's judgment." *(Kubby, supra*, 97 Cal.App.4th at p. 626.) In *Allen v. Georgia* (1897) 166 U.S. 138, 141 [41 L.Ed. 949, 17 S.Ct. 525], the United States Supreme Court observed that if a fugitive is not barred from pursuing an appeal while absent, "he is put in a position of saying to the court: 'Sustain my writ and I will surrender myself, and take my chances upon a second trial; deny me a new trial and I will leave the State, or forever remain in hiding.' We consider this as practically a declaration of the terms upon which he is willing to surrender, and a contempt of its authority, to which no court is bound to submit. It is much more becoming to its dignity that the court should prescribe the conditions upon which an escaped convict should be permitted to appear and prosecute his writ, than that the latter should dictate the terms upon which he will consent to surrender himself to its custody."

This need to vindicate the integrity of the judicial system has been considered, under some circumstances, so significant that the disentitlement doctrine has been imposed on a nonfugitive defendant who has signaled by his conduct that he will only accept a decision in his favor. In *People v. Brych* (1988) 203 Cal.App.3d 1068 [250 Cal.Rptr. 402], the appellant had served his sentence and lawfully emigrated from the United States, but his appeal remained pending. *(Id.* at p. 1075.) Brych refused to communicate with his counsel or to divulge his whereabouts. *(Id.* at p. 1077.) The Court of Appeal concluded that the disentitlement doctrine should apply even though the appellant was not a fugitive, because the court could not be sure it was making a decision that could be enforced; because the legal issues were no longer tethered to an available litigant; and because the appellant would accept only an outcome agreeable to him. The court wrote, "Appellant thus has placed himself in the enviable position of being able to decide unilaterally whether to return to the United States in the event this court reverses his conviction and the district attorney determines a retrial is feasible. We cannot reasonably assume that, if ordered to return to this jurisdiction for retrial,

appellant would learn of such order and return voluntarily, or that he could be compelled to return. Such an approach on appellant's part to the present appeal is inherently offensive to the judicial process." (*Ibid.*)

The disentitlement doctrine "serves an important deterrent function" (*Ortega-Rodriguez v. United States* (1993) 507 U.S. 234, 242 [122 L.Ed.2d 581, 113 S.Ct. 1199] (*Ortega-Rodriguez*)): it discourages the felony of escape and encourages voluntary surrenders. (*Degen, supra*, 517 U.S. at p. 824.) Disentitlement also " 'promotes the efficient, dignified operation' of the courts." (*Ibid.*) Finally, in appropriate cases, disentitlement protects the people from prejudice by the passage of time in the event of a reversal on appeal. (*Ortega-Rodriguez*, at p. 249 [disentitlement may be "an appropriate response" where "a long escape . . . so delay[s] the onset of appellate proceedings that the Government would be prejudiced in locating witnesses and presenting evidence at retrial after a successful appeal"]; *People v. Kang* (2003) 107 Cal.App.4th 43, 51 [131 Cal.Rptr.2d 447] (*Kang*).)

## B. *The Balance of Equitable Considerations*

Fugitive disentitlement, however much it may advance legitimate policies (*U.S. v. Veliotis* (S.D.N.Y. 1984) 586 F.Supp. 1512, 1515 (*Veliotis*)), is not an automatic rule but a discretionary tool of the courts that may only be applied when the balance of all equitable concerns leads the court to conclude that it is a proper sanction for a party's flight. (*U.S. v. Van Cauwenberghe* (9th Cir. 1991) 934 F.2d 1048, 1054 (*Van Cauwenberghe*) ["The disentitlement doctrine . . . is not one of jurisdictional dimensions, but rather one based on equitable considerations."].) The doctrine is a blunt weapon, not appropriate in every matter in which a party has fled criminal prosecution. For instance, the United States Supreme Court held that the trial court was not justified in striking the filings of a claimant in a civil forfeiture action and granting summary judgment against him because of his failure to appear in a related criminal prosecution.[18] (*Degen, supra*, 517 U.S. at pp. 821, 825.) The Supreme Court considered all the justifications for the doctrine and concluded that the balance of the equitable concerns clearly did not tip in the direction of disentitlement. First, the defendant's absence posed no risk of delay or frustration in determining the merits of the forfeiture claims. (*Id.* at p. 825.) Second, the property in question was secure and any ultimate judgment would clearly be enforceable. (*Ibid.*) Third, although there existed a legitimate concern that the criminal prosecution of the defendant might be compromised by his participation in the forfeiture case, the trial court could

---

[18] In response to the decision in *Degen, supra*, 517 U.S. 820, Congress enacted the Civil Asset Forfeiture Reform Act of 2000 (Pub.L. 106-185 (Apr. 25, 2000) 114 Stat. 202), which authorizes federal judicial officers to disentitle fugitives from participating in forfeiture actions under specific conditions. (28 U.S.C. § 2466.)

manage and minimize any impact on the criminal matter by finely tailored rulings rather than a flat ban on participation. (*Id.* at pp. 825–826.) Although the interests in redressing the affront to the courts of the defendant's flight and the need to deter flight by others were "substantial," "disentitlement is too blunt an instrument for advancing them." (*Id.* at p. 828.)

■ The Supreme Court acknowledged its "disquiet at the spectacle of a criminal defendant reposing in Switzerland, beyond the reach of our criminal courts, while at the same time mailing papers to the court in a related civil action and expecting them to be honored." (*Degen, supra,* 517 U.S. at p. 828.) Uncomfortable though the Supreme Court was at the prospect of Degen litigating a civil forfeiture action while avoiding criminal prosecution, "A court-made rule striking Degen's claims and entering summary judgment against him as a sanction . . . would be an arbitrary response to the conduct it is supposed to redress or discourage." (*Ibid.*) A careful balance of the equities mandated that the fugitive disentitlement doctrine not be applied: "There would be a measure of rough justice in saying Degen must take the bitter with the sweet, and participate in the District Court either for all purposes or none. But the justice would be too rough. A court's inherent power is limited by the necessity giving rise to its exercise. There was no necessity to justify the rule of disentitlement in this case; to strike Degen's filings and grant judgment against him would be an excessive response to the concerns here advanced." (*Id.* at p. 829.)

Similarly, in *Ortega-Rodriguez, supra,* 507 U.S. 234, the United States Supreme Court considered the equities of mandating the dismissal of an appeal of a defendant who fled the jurisdiction of a district court but was recaptured before appealing. The court ruled that the fugitive disentitlement doctrine could not be applied under these circumstances because the balance of the equitable concerns did not support it: "the justifications we have advanced for allowing appellate courts to dismiss pending fugitive appeals all assume some connection between a defendant's fugitive status and the appellate process, sufficient to make an appellate sanction a reasonable response. These justifications are necessarily attenuated when applied to a case in which both flight and recapture occur while the case is pending before the district court, so that a defendant's fugitive status at no time coincides with his appeal." (*Id.* at p. 244, fn. omitted.) Enforceability would not be a concern, because the recaptured defendant would be within the control of the appellate court throughout the appeal and issuance of judgment. (*Ibid.*) The efficient operation of the appellate process would not be advanced by dismissing appeals filed after former fugitives are recaptured, because legal matters relating to the escape most likely would have been litigated at the time of recapture. (*Id.* at p. 245.) The dismissal of a former fugitive's appeal would not protect or advance the dignity of the appellate court, and trial courts may defend their own dignity. (*Id.* at pp. 245–246.) Moreover, a rule

"allow[ing] an appellate court to sanction by dismissal any conduct that exhibited disrespect for any aspect of the judicial system, even where such conduct has no connection to the course of appellate proceedings . . . would sweep far too broadly, permitting, for instance, this Court to dismiss a petition solely because the petitioner absconded for a day during district court proceedings, or even because the petitioner once violated a condition of parole or probation." (*Id.* at p. 246.) Finally, such a broad disentitlement rule would not advance the principle of deterrence any more effectively than would a more limited rule: "Once jurisdiction has vested in the appellate court, . . . then any deterrent to escape must flow from appellate consequences, and dismissal may be an appropriate sanction by which to deter. Until that time, however, the district court is quite capable of defending its own jurisdiction. While a case is pending before the district court, flight can be deterred with the threat of a wide range of penalties available to the district court judge." (*Id.* at p. 247.)

"Accordingly," ruled the Supreme Court, "we conclude that while dismissal of an appeal pending while the defendant is a fugitive may serve substantial interests, the same interests do not support a rule of dismissal for all appeals filed by former fugitives, returned to custody before invocation of the appellate system. Absent some connection between a defendant's fugitive status and his appeal, as provided when a defendant is at large during 'the ongoing appellate process,' [citation], the justifications advanced for dismissal of fugitives' pending appeals generally will not apply." (*Ortega-Rodriguez, supra,* 507 U.S. at p. 249.)

California courts, too, have declined to apply the disentitlement doctrine when the equities did not support it. In *Kang, supra,* 107 Cal.App.4th at page 48, the Court of Appeal addressed the question of whether a former fugitive whose initial appeal had been dismissed could pursue an appeal anew after his recapture. Considering the factors traditionally evaluated in the disentitlement analysis, the court concluded that it should decide Kang's appeal on its merits. (*Id.* at p. 51.) Enforceability was no longer a problem, because Kang was back in custody. (*Ibid.*) Moreover, "[i]t may be true that Kang flouted the authority of the trial court when he failed to appear for sentencing and became a fugitive, but disentitlement of Kang to foreclose appellate review is not desirable. If it is essential to vindicate judicial authority, the prosecution may charge Kang with failure to appear pursuant to Penal Code section 1320.5, although the penalty for that crime pales in comparison with the sentence imposed by the trial court. Put in perspective, disentitlement is largely symbolic. Also, any consideration that dismissal discourages escape is speculative at best." (*Id.* at pp. 51–52.) The court considered the most significant factor to be the impact that Kang's fugitive status had on the appellate process: his appeal could have been combined with that of his codefendants had he been present. (*Id.* at p. 52.) The court questioned

whether there would be prejudice to the government because "it would be impossible to convene a new trial due to the unavailability of witnesses and other evidence," but found no evidence of prejudice. (*Ibid.*) The court concluded, "Even though Kang's fugitive status precluded consolidation of his appeal with his codefendants' appeals, which resulted in the loss of an efficient disposition of these related appeals, that is an inadequate basis by itself to disallow appellate review." (*Ibid.*)

In a noncriminal context, courts routinely decline to disentitle litigants on the basis of contempt, fugitive status, or noncompliance with court orders when the issues raised by the litigant entail interests beyond the personal of the individual petitioner, such as the welfare of minor children or overarching issues of public interest and policy. The California Supreme Court, in the divorce case *Hull v. Superior Court* (1960) 54 Cal.2d 139 [5 Cal.Rptr. 1, 352 P.2d 161], confirmed the disentitlement doctrine but noted that the court need not disentitle a petitioner if the public interest will be better served by handling the matter on its merits: "A court should have the right to deny its processes and aid to one who stands in contempt or is in contempt of its orders. One who has wilfully refused to comply with the mandate of a court cannot then compel that court to do his bidding. But it must be remembered that even though the moving party has been adjudicated in contempt, the court is not required to bar entry of the final decree, but such action remains within the trial court's discretion. If the court determines that the public interest will be better served by finally and permanently dissolving the marital status it is entirely within its power to do so. [Citation.]" (*Id.* at p. 146.) Similarly, in *Smith v. Smith* (1955) 135 Cal.App.2d 100 [286 P.2d 1009], the Court of Appeal refused to apply the disentitlement doctrine against an absconding father because, inter alia, his appeal raised questions of the best interests of the minor children involved. As the court explained, "The personal rights of the parties are by no means the sole subject of judicial concern." (*Id.* at p. 107; see also *Dupes v. Dupes* (1919) 43 Cal.App. 67, 69 [184 P. 425] [declining to dismiss mother's appeal in a dissolution matter based on "consideration for the welfare of the minors and of their probable ultimate disposition, as well also the interest the state has in the maintenance of the marital state"].)

C. *Standard of Review*

The trial court's ruling on a request for dismissal in the furtherance of justice under section 1385 is reviewed for an abuse of discretion. (*Carmony, supra,* 33 Cal.4th at p. 375.) As the application of the disentitlement doctrine is abundantly within the court's discretion (see, e.g., *People v. Buffalo* (1975) 49 Cal.App.3d 838, 839 [123 Cal.Rptr. 308]; *Van Cauwenberghe, supra,* 934 F.2d at pp. 1054–1055), we review the trial court's refusal to consider

exercising its discretionary authority to dismiss the action on the basis of this doctrine for an abuse of that discretion. "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004 [81 Cal.Rptr.3d 299, 189 P.3d 300].)

"The abuse of discretion standard is 'deferential,' but it 'is not empty.' [Citation.] '[I]t asks in substance whether the ruling in question "falls outside the bounds of reason" under the applicable law and the relevant facts [citations].' [Citation.]" (*People v. Giordano* (2007) 42 Cal.4th 644, 663 [68 Cal.Rptr.3d 51, 170 P.3d 623] (*Giordano*).) " 'Obviously the term is a broad and elastic one [citation] which we have equated with "the sound judgment of the court, to be exercised according to the rules of law." [Citation.]' [Citation.] Thus, '[t]he courts have never ascribed to judicial discretion a potential without restraint.' [Citation.] 'Discretion is compatible only with decisions "controlled by sound principles of law, . . . free from partiality, not swayed by sympathy or warped by prejudice . . . ." [Citation.]' [Citation.] '[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' [Citation.]" (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977 [60 Cal.Rptr.2d 93, 928 P.2d 1171] (*Alvarez*).)

Review for an abuse of discretion gives appropriately broad latitude to the trial court with respect to discretionary decisions that involve balancing equitable considerations. The trial court's " 'decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." [Citations.]' [Citation.]" (*Alvarez, supra*, 14 Cal.4th at p. 978.)

### D. *Denying the Request for Dismissal and Applying the Fugitive Disentitlement Doctrine Was Not an Abuse of Discretion*

We have thoroughly reviewed the record of the proceedings in this matter as well as the allegations made by Polanski of serious misconduct by the original judge and a member of the district attorney's office. Even though the allegations, if ultimately found to be true, present a very significant systemic issue of injustice and misconduct, we cannot conclude that the trial court abused its discretion here in precluding Polanski from affirmatively seeking relief from the trial court until he submitted to its jurisdiction. Contrary to Polanski's argument, the trial court did not simply deny Polanski's request for relief because of his status as a fugitive, without weighing any equitable

factors. To the contrary, the court exercised its discretion in reaching its conclusion, and its thoroughly considered ruling was in no respect arbitrary, capricious, or patently absurd.[19]

### 1. *Factors Considered by the Trial Court*

██ Many of the traditional reasons for applying the disentitlement doctrine are present here. Above all, as the trial court recognized, Polanski has engaged in exactly the kind of conduct that the disentitlement doctrine is designed to combat—seeking relief from the courts while "insulating [himself] from the consequences of an unfavorable result." (*Antonio-Martinez v. INS* (9th Cir. 2003) 317 F.3d 1089, 1093.) If the trial court had acceded to Polanski's request that the criminal proceedings be dismissed, he would of course have accepted that ruling. But under the preapprehension circumstances facing the trial court when it ruled, the court lacked any ability to enforce any judgment it might render if it declined to dismiss the action—because a dissatisfied Polanski would simply remain abroad. This is the " 'heads I win, tails you'll never find me' " (*ibid.*) dynamic that arises when a fugitive seeks to undercut criminal proceedings against himself or herself without subjecting himself or herself to the criminal justice system. This fundamental enforceability problem is at the core of the disentitlement doctrine. (*Redinger, supra,* 55 Cal. at p. 298.) We recognize that Polanski argues that his flight was warranted and necessary, but his actions are nonetheless the archetypal conduct warranting disentitlement.

██ Moreover, as the trial court observed, the doctrine's motivating aspect was applicable here. One intent of the doctrine is to encourage voluntary surrenders (*Degen, supra,* 517 U.S. at p. 824) by dangling the carrot of review before runaway litigants, to be delivered when the litigant returns to the jurisdiction. A trial court possesses few options for inducing a fugitive who has left the jurisdiction to voluntarily return, and denying Polanski relief until he returned to California by denying the request without prejudice to a future request struck a balance between punishing Polanski for leaving and offering him the opportunity to seek relief as soon as he honored the court's order to appear.

---

[19] Although Geimer has asked this court to dismiss the prosecution, she neither filed a petition for writ relief nor formally joined in Polanski's petition for writ of mandate. Geimer's contention that article I, section 28 of the California Constitution confers on crime victims a right to independently require the trial court to consider whether to exercise its discretion under section 1385 was not briefed by any participant in this proceeding, and we therefore do not reach that issue. We note, however, that Geimer asked the trial court to consider her views in deciding whether to exercise its discretion to dismiss the prosecution, and that the court's order reflects that in balancing the equitable considerations the court "read and considered" Geimer's declaration. As explained below, we find no abuse of discretion by the trial court.

The trial court also considered the deterrent aspect of the fugitive disentitlement doctrine, usually one of the less explored considerations in the doctrine's application. Although some courts have expressed skepticism that the disentitlement doctrine serves a deterrent purpose (see *Kang, supra*, 107 Cal.App.4th at p. 52 ["any consideration that dismissal discourages escape is speculative at best"]), the trial court observed that the long-standing public fascination with this case increased its deterrent potential. Polanski's claim that there is no potential deterrent effect here because any other defendant in Polanski's shoes would react as Polanski did both underestimates other defendants' abilities to identify legal alternatives to flight and fails to consider the possible general deterrent effect on defendants who do not believe themselves to be victims of irremediable misconduct. We cannot gainsay the trial court's reasoned conclusion that the public interest and media coverage of all developments in this matter would tend to increase the potential deterrent effect on others of refusing to grant Polanski relief unless he returns to California and appears in court.

Another consideration weighed in the balance by the trial court was the court's ability to protect its own dignity from a litigant who defies the court's authority. We need not add our voice to the chorus of courts that have expressed indignation at the prospect of a fugitive litigant demanding affirmative relief from the courts while remaining safely ensconced outside the jurisdiction and protected from an adverse decision, but we note that this was a proper consideration for the trial court, which is entitled to and empowered to protect its own dignity. This interest is not paramount—were there no other factors weighing in favor of disentitlement, we believe that the interest in self-protection alone could not merit reliance on the doctrine—but here it is one factor among many that support disentitlement. Polanski contends that justifying disentitlement on the basis of protecting the court's dignity is unreasonable because the court's conduct prompted his flight, but as we will discuss further, *post*, Polanski could have availed himself of mechanisms for raising his allegations of judicial misconduct short of being disrespectful of the entire judicial process by fleeing.

The trial court also rejected Polanski's argument that he was not flouting the process of the law or attempting to obtain a tactical advantage over the court, noting that the very court that set forth the concept of an attempt to obtain a tactical advantage described it as being in a position "to await the judicial result and return if it is favorable or to remain a fugitive if it is not." (*Katz v. U.S.* (9th Cir. 1990) 920 F.2d 610, 612, abrogated on other grounds in *Lozada v. Deeds* (9th Cir. 1992) 964 F.2d 956.) That, as the trial court saw, is exactly what Polanski tried to do here. Polanski claims that he was not seeking a tactical advantage because he was "not challenging his judgment," but Polanski clearly attempted to see if he could secure complete relief without risk: He filed his request asking the court to exercise its discretion

under section 1385 to dismiss the criminal prosecution against him and wipe the slate clean (*People v. Barro* (2001) 93 Cal.App.4th 62, 67 [112 Cal.Rptr.2d 797] (*Barro*)), and when that request yielded no benefit, he advised the court that he would not return during the stay of the ruling on the section 1385 request, a stay ordered expressly to allow Polanski to return for a hearing on the merits. Clearly Polanski did not surrender to California authorities prior to his arrest in Switzerland.

Finally, the court considered how long Polanski had waited before requesting the dismissal of the charges and the prejudice resulting from the delay. Polanski's delay appears to have been unjustifiable under the facts of the case. Polanski may not have known of the alleged contacts between Wells and Judge Rittenband until 2008, but he was well aware of the misconduct he alleges by Judge Rittenband in 1977 and 1978. Without minimizing the seriousness of the misconduct that Wells appears to have revealed in his 2008 interviews, the core of the alleged injustice in this matter is Judge Rittenband's conduct. If Wells's account is true, Judge Rittenband was ushered along a path of iniquity by an officer of the court with a personal axe to grind and no hesitation to engage in unethical ex parte communications and devise illegal, nonappealable sentences to circumvent the defendant's due process and sentencing rights—but it remains Judge Rittenband who imposed an improper punishment, said he would renege on the punishment agreement, threatened to sentence Polanski to prison with unlawful conditions for his release, and engaged in improper conduct with the media and others not involved in the matter. Polanski knew about all this judicial conduct at the time of his flight, but did not seek dismissal of the prosecution for more than 30 years. During that time, many of the players have retired and the judge alleged to have compromised the justice system has died. Polanski's delay in seeking relief when he had all the information he needed to make a case of judicial misconduct has negatively impacted the justice system's ability to ascertain the truth here, for we will never be able to hear Judge Rittenband's full account of events and are left with only a short written document from 1978.[20]

## 2. *The Availability of Legal Remedies Other Than Flight*

Polanski argues that the trial court should be precluded from invoking the disentitlement doctrine to deny him relief today because his absence resulted

---

[20] While we do not consider this in the balance of equities concerning disentitlement, another unfortunate consequence of the delay here in seeking an evidentiary hearing on these allegations is that the justice system's ability to police its own through disciplinary proceedings was frustrated, and a judge whose ethics and conduct are strongly questioned was left on the bench for more than a decade without closer oversight. Of course, Polanski and his counsel are not the only actors who could have prompted a timely investigation, as it is also alleged that much of this conduct took place in the presence of other lawyers.

from the original trial judge's own misconduct in failing to abide by the sentencing agreement and threatening Polanski with additional incarceration coupled with illegal deportation conditions. Even in light of our fundamental concern about the misconduct that has been alleged here with significant evidentiary support, flight was not Polanski's only option. It was not even his best option. From the record Polanski has provided to this court, at the time he fled Polanski knew what he needed to know to make a case for a violation of due process,[21] and at all times in this matter, he has had means at his disposal other than flight by which he could have obtained relief.

 a. *Remedies Available to Polanski as of January 31, 1978*

Contrary to his hyperbolic claim that he was "provoked (indeed, compelled)" to flee the country to escape an illegal sentence, there is no evidence that Polanski was without a remedy when he fled in 1978. Polanski appears to be under the impression that he would not have been able to obtain any relief in the superior court because Judge Rittenband would have denied either a stay of any jail sentence he imposed or bail pending appeal. It seems probable to us too that Judge Rittenband would not have granted either of those requests, but we cannot imagine why those would be Polanski's only options in the trial court. Polanski's counsel clearly knew how to proceed on a disqualification for cause—he did so soon thereafter with the disqualification papers he filed on February 14, 1978.

Aside from the judge's postflight press conference, all the wrongful conduct alleged in the statement of disqualification for cause had already occurred before the February 1, 1978 sentencing hearing. Instead of fleeing and then urging disqualification, Polanski could have raised these issues of judicial misconduct by attending the sentencing hearing on February 1, 1978, and filing the statement of disqualification for cause at that time. The statute governing disqualifications at that time, Code of Civil Procedure former section 170, provided that "No justice or judge shall sit or act as such in any action or proceeding" under a variety of circumstances, including "[w]hen it is made to appear probable that, by reason of bias or prejudice of such justice or judge a fair and impartial trial cannot be had before him." (Code Civ. Proc., former § 170, subd. (5), as amended (Stats. 1977, ch. 1257, § 6,

---

[21] There was one layer of alleged misconduct of which Polanski could not have been aware at the time he fled, or, indeed, until recently: the alleged relationship between Judge Rittenband and Wells, their alleged ex parte communications concerning the case, and Wells's apparent personal agenda in the matter. These recent revelations add to, but do not fundamentally change, Polanski's evidence and argument that justice was miscarried here. With or without knowledge of Wells's alleged operations behind the scenes, at the time Polanski fled he already had reason to know, and evidence to demonstrate, that the process of negotiating his punishment for the offense to which he had pleaded guilty had veered constitutionally off course.

pp. 4755, 4756).) The law provided, "No judge who shall deny his disqualification, shall hear or pass upon the question of his own disqualification; but in every such case, the question of the judge's disqualification shall be heard and determined by some other judge . . . ." (Code Civ. Proc., former § 170, subd. (5), as amended (Stats. 1977, ch. 1257, § 6, pp. 4755, 4757).) Provided that the statement was legally sufficient on its face to state a claim of bias or prejudice, it would have had the "immediate effect" of depriving Judge Rittenband of the authority to proceed with substantive matters until the question of disqualification was resolved. (*Oak Grove School Dist. v. City Title Ins. Co.* (1963) 217 Cal.App.2d 678, 706 [32 Cal.Rptr. 288] ["Plaintiff's statement being legally sufficient, it estopped Judge Callaghan from determining his own qualifications to sit as the trial judge in the proceeding, and it had the immediate effect of depriving him of jurisdiction to decide the motion to tax costs."].)

Had Polanski availed himself of this alternative to flight, presumably Judge Rittenband would have recognized that the filing of a facially valid statement of disqualification left him "without power to pass upon the question of his own disqualification and . . . without jurisdiction to hear the cause unless and until, after a hearing had by another judge in the manner prescribed by section 170, petitioner's objections had been overruled and the judge had been found not to be disqualified to act." (*In re Harrington* (1948) 87 Cal.App.2d 831, 834–835 [197 P.2d 783].) If, however, the trial court had refused to suspend the proceedings and nonetheless proceeded to sentencing that day, there would have been two consequences. First, Polanski would have been able to seek habeas corpus relief on the basis of the court's failure to follow the disqualification process;[22] and second, Polanski could have demanded a hearing to present his evidence of the court's sentencing commitment and its misconduct. Polanski argues that the court had already stated that it would

---

[22] In *In re Harrington, supra,* 87 Cal.App.2d 831, the Court of Appeal granted habeas corpus relief to a defendant convicted at a trial held after he had sought disqualification for cause but the judge proceeded in disregard of his statement of disqualification. Before the trial began, the defendant attempted to disqualify the judge for cause under Code of Civil Procedure former section 170, but the trial court "disregarded the objections, declared that he was not disqualified, and ordered the cause to proceed to trial immediately." (*In re Harrington,* at p. 832.) Because the disqualification papers stated sufficient facts to require another judge to pass on the disqualification question, the trial court could not proceed until the disqualification question was resolved. (*Id.* at pp. 834–835.) The court having proceeded nonetheless, habeas corpus relief was appropriate: "Since the judge who heard the case was not qualified at the time of the hearing to act, it follows that by virtue of a void judgment and commitment petitioner is held in custody from which he is entitled to be released," although he would be held in local custody pending a new trial before a judge not disqualified from handling the matter. (*Id.* at p. 835.) (See also *Giometti v. Etienne* (1934) 219 Cal. 687, 689 [28 P.2d 913] [judgment rendered by disqualified judge is void].) More recent decisions have characterized the acts of a judge subject to disqualification as voidable rather than void. (See, e.g., *Betz v. Pankow* (1993) 16 Cal.App.4th 931, 938–940 [20 Cal.Rptr.2d 841].)

not permit any hearing prior to sentencing. Because Polanski chose to flee, it cannot be known whether the court actually would have followed through and denied Polanski a hearing to which he was entitled before sentence was imposed if Polanski had actually demanded one in open court.

If the court had indeed denied a hearing prior to imposing sentence, while Polanski is correct that the issue of misconduct would not have been cognizable on direct appeal because he would have been denied the opportunity to make a record of the misconduct, "[o]ur state Constitution guarantees that a person improperly deprived of his or her liberty has the right to petition for a writ of habeas corpus." (*People v. Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252].) A petition for habeas corpus is the appropriate vehicle for obtaining review of issues requiring consideration of matters outside the record. (*People v. Jones* (2003) 29 Cal.4th 1229, 1263 [131 Cal.Rptr.2d 468, 64 P.3d 762].) Had the court sentenced Polanski to any further incarceration, Polanski could have filed an immediate petition for habeas corpus with a request that the sentence be stayed pending the petition's resolution.

On the other hand, when confronted with a request for a hearing in open court that it appears the prosecutor would have supported,[23] the trial court might have granted the hearing requested by Polanski—or perhaps the court would have avoided it by agreeing to comply with the prior sentencing commitment the court is alleged to have made. If a hearing had been requested on the record and granted, by Polanski's account at least three people could have testified at the sentencing hearing to the trial court's agreement that the diagnostic study would constitute Polanski's entire punishment: Dalton, Gunson, and probation officer Gold. These three witnesses as well as Geimer's attorney, Lawrence Silver, could have testified to the other misconduct occurring in their presence, if Polanski's allegations are true. We cannot know what Judge Rittenband would have done in response to this testimony, but even if he had sentenced Polanski on February 1, 1978, to time in state prison or county jail, based on the evidence that Polanski could have developed at the sentencing hearing Polanski would have been able to seek an immediate stay of any commitment pending review of the sentence.

We acknowledge that if a term of imprisonment had been imposed at the sentencing hearing on February 1, 1978, Polanski would have remained in custody for the time it would have taken to prepare, as appropriate, an appeal and/or a petition for writ of habeas corpus and to seek a stay of the sentence. Still, Polanski had more than enough information concerning judicial misconduct at the time of his flight to have sought prompt relief even if the trial

---

[23] Dalton declared that in chambers, Gunson "pointed out that the question of the hearing should be resolved before the Judge imposed a sentence."

court had imposed a sentence beyond time served at the sentencing hearing on February 1, 1978. Polanski simply was not without a remedy other than flouting the judicial system through flight.[24]

b. *Remedies Available to Polanski After His Flight*

Polanski's potential avenues for relief actually increased soon after his flight. In response to the disqualification papers, Judge Rittenband consented to the transfer of the case out of his department in late February 1978. At that point, Polanski could have returned without fear that he would be subjected to any further injustice at Judge Rittenband's hands. Moreover, Polanski has not offered any evidence that he had a legitimate reason to fear that any other judge of the superior court would have sentenced him to incarceration beyond the time he had already spent undergoing the diagnostic study. While the evidence has not yet been tested by a hearing, all the evidence submitted to this court suggests that the contrary is true. Dalton alleged in February 1978 that after Judge Rittenband announced his intention to disregard his prior commitment and to sentence Polanski to incarceration, with instructions to the parties as to what to argue at the sentencing hearing, "both Gunson and Dalton stated that they would not permit themselves to act out the roles assigned to them by the Judge in such a staged proceeding which was for the benefit of the press and with the result already pre-determined by the Judge." Gunson, too, has declared that he read the disqualification papers before they were filed and that he agreed with them. In light of Polanski's evidentiary showing that both the prosecutor and the defense attorney substantially agreed concerning the details of the punishment arrangements to be imposed by the trial court, even though the deal was unrecorded, if Polanski had been able to prove his allegations by admissible evidence at that time, it is difficult to imagine any new bench officer failing to honor a prior agreement that had already been performed by Polanski.

c. *Polanski's 1997 Refusal of Resolution with No Further Incarceration*

Importantly for the purposes of analyzing the equities of applying the disentitlement doctrine here, not only has Polanski had legal alternatives to

---

[24] Indeed, Dalton revealed in an interview for the Polanski film that he advised Polanski prior to his flight that Polanski would likely be able to secure relief from the sentence they feared the trial court would impose: "I contacted Roman and I said for them to come to my office and discuss what was going to happen the following morning. I told them it was my opinion that the sentence would be illegal, that we could probably obtain relief on appeal but that would involve[] a long procedure and Polanski would be incarcerated during that period of time." Dalton has declared under penalty of perjury that he accurately related the events in his interview for the film. Nothing in the record sheds any light on why Dalton would not have foreseen, if in fact he did not foresee, that on the facts that he alleges, Polanski would have been able to seek an immediate stay of the sentence pending appellate resolution of the issues.

flight at all times in this matter, it appears that he deliberately opted to remain a fugitive despite a proposal for relief made by the trial court, Judge Fidler, in 1997. Polanski's own moving papers and accompanying evidence reveal that Polanski has previously been offered full relief from the alleged injustices perpetrated by the trial court in 1977 and 1978 but that Polanski rejected that relief because the trial court indicated that the proceedings would be televised.[25] According to Dalton's declaration, in 1997 Judge Fidler "stated that he would honor the agreement made by Judge Rittenband that the period of incarceration for Mr. Polanski while undergoing the diagnostic study would constitute the full and complete punishment. [¶] After considering the materials we submitted and after discussions with Mr. Gunson and me, Judge Fidler advised us that, if Mr. Polanski returned to Los Angeles, he would allow Mr. Polanski to be booked and immediately released on bail, require Mr. Polanski to meet with the probation department, order a probation report, conduct a hearing, and terminate probation without Mr. Polanski having to serve any additional time in custody."

Polanski refused. According to Dalton, Polanski personally decided not to accept the trial court's offer to resolve the case without any further potential exposure to jail or prison time because Polanski did not want television coverage of the sentencing proceedings.

Polanski's complaints that he has been denied justice for more than 30 years decrease significantly in persuasive force in light of his refusal to resolve the pending criminal proceedings as originally allegedly promised by Judge Rittenband simply because the hearing would not be sufficiently private. This is not the case of a man who for 31 years has been effectively unfairly exiled from the United States because he was left with no remedy but flight in the face of alleged misconduct by the trial court. Instead it appears to be a case in which the litigant wants not only to obtain relief for the events that occurred long ago but also to direct the conditions under which that relief is dispensed. In the consideration of the equities of disentitlement here, the fact that Polanski has chosen to remain a fugitive tends to considerably diminish any injustice that would otherwise be wrought by the trial court's refusal at this time to permit him to solicit relief from the criminal proceeding while he remains aloof from the court.

---

[25] We recognize that there exists some controversy as to whether the trial court actually insisted that the proceedings upon Polanski's return would be televised, but the record contains no dispute that Polanski declined to return despite the pledge of no further time in prison because he was dissatisfied, not with the trial court's offer, but with the conditions surrounding the hearing that would be held.

### d. *Remedies Available to Polanski Today*

Even now Polanski has remedies besides seeking a dismissal of the entire action from this court while remaining a fugitive. While section 977, subdivision (b)(1) imposes a general requirement of personal appearance for sentencing in felony matters, section 1193 permits defendants to be sentenced in absentia when specific conditions are met. Whether the offense is treated as a misdemeanor or a felony,[26] Polanski could request to be formally sentenced in absentia. Section 1193, subdivision (a) provides that when a defendant is convicted of a felony, "the defendant shall be personally present when judgment is pronounced against him or her, unless the defendant, in open court and on the record, or in a notarized writing, requests that judgment be pronounced against him or her in his or her absence, and that he or she be represented by an attorney when judgment is pronounced, and the court approves his or her absence during the pronouncement of judgment, or unless, after the exercise of reasonable diligence to procure the presence of the defendant, the court shall find that it will be in the interest of justice that judgment be pronounced in his or her absence . . . ."[27] Sentences for misdemeanors, of course, may be imposed in absentia without the satisfaction of any conditions. (§ 1193, subd. (b).) At sentencing, Polanski's counsel could argue that the proper sentence is the time already served.

Polanski could also cooperate with the extradition process and return to California. Once back in the jurisdiction, he could request that the trial court exercise its discretion to dismiss the prosecution in the interest of justice under section 1385. Alternatively, as he had already fulfilled the terms of the agreed sentence he alleges, he could appear for the formal sentencing hearing from which he fled and ask the trial court to honor those sentencing provisions. Potentially more expeditiously, upon his return he could immediately file a petition for writ of habeas corpus with a request for an immediate stay of all further sentencing proceedings. While we neither claim an ability to predict the future nor purport to prejudge any matter for ourselves or for the trial court, the evidentiary showing that he has mustered in support of this petition would appear highly likely to merit both a stay and an immediate review of the propriety of any continued detention. While Polanski most likely would have to incur some amount of custodial detention while his allegations were addressed—for it is difficult to envision a California court offering bail to a recently extradited long-standing fugitive with family and residence outside the country—if he would return to this jurisdiction it

---

[26] At the plea hearing in this case, Polanski specifically pleaded guilty to the offense as a felony, but on the record he acknowledged that the judge would decide whether he would receive a felony sentence or a misdemeanor sentence.

[27] Based on the oral arguments of counsel, this court would not expect any objection to be made if Polanski should request to be sentenced in absentia.

appears that he would soon thereafter be able to establish a factual record of, and obtain all appropriate relief for, the very serious misconduct that it appears may have occurred here.

Polanski is not without any remedy. He is only without the remedy that he prefers: complete release not only from any threat of future punishment, but also from the very charges themselves—despite the fact that no misconduct has been alleged impacting the validity or voluntariness of Polanski's plea to unlawful sexual intercourse—and all without ever having to subject himself to the jurisdiction of the court.

### e. Impact on the Balance of Equities of the Availability of Alternative Remedies

The existence of legal alternatives to flight is a highly significant consideration in evaluating whether a defendant should be disentitled from seeking relief from the courts. In *Kubby, supra*, 97 Cal.App.4th 619, the defendant fled after the court ordered probation and a jail term. He argued, inter alia, that the appellate court should not apply the disentitlement doctrine because of his severe health issues. (*Id.* at p. 628.) Kubby claimed that he required medical marijuana to control his symptoms and that he would die without it while serving his sentence. (*Ibid.*) The court expressed sympathy for Kubby's medical condition but found that it did not bar disentitlement. Kubby, the court explained, had legal alternatives to violating the court's order, such as seeking a stay or asking for bail pending resolution of the appeal. (*Id.* at pp. 628–629.) "Indeed, the trial court suggested that defendant move for a stay of execution of the order of probation, but for reasons left unexplained, defendant failed to avail himself of that opportunity. Instead, he decided to take the law into his own hands and flee the jurisdiction of the court. For that, we have little sympathy." (*Id.* at p. 628.)

### 3. Van Cauwenberghe *and* Doe v. Superior Court *(*Polanski*) Do Not Compel a Different Result*

Polanski argues that the fugitive disentitlement doctrine should not be applied to him, citing *Van Cauwenberghe, supra*, 934 F.2d 1048 and *Doe v. Superior Court (Polanski)* (1990) 222 Cal.App.3d 1406 [272 Cal.Rptr. 474]. Neither case establishes an abuse of discretion here.

In *Van Cauwenberghe, supra*, 934 F.2d 1048, Van Cauwenberghe had been sentenced to a jail term, fines, and five years' probation. (*Id.* at p. 1051.) He served his time, paid his fines, and satisfied the terms of probation by paying restitution and remaining in the United States until the restitution was paid. (*Id.* at pp. 1051, 1054.) The district court even made an order that

Van Cauwenberghe had turned over sufficient property to pay the restitution and that " 'there [was] no further probationary purpose to be served by requiring Van Cauwenberghe to remain in the United States.' " (*Id.* at p. 1051.) The government subsequently agreed that Van Cauwenberghe could return to Belgium—but, unbeknownst to the government, Van Cauwenberghe had already left the country prior to the government's agreement. (*Id.* at pp. 1052, 1054.) By leaving the country before he had received permission to do so, Van Cauwenberghe violated a condition of his probation, and a bench warrant was issued. (*Id.* at p. 1054.)

The following year, Van Cauwenberghe moved for the return of the portion of the proceeds from the liquidation of the property he had surrendered that exceeded the amount necessary to pay his fines and restitution. (*Van Cauwenberghe, supra*, 934 F.2d at p. 1052.) The court refused to refund the excess, and Van Cauwenberghe appealed. (*Ibid.*) He also appealed rulings in a related civil case. (*Id.* at p. 1053.)

The Ninth Circuit Court of Appeals weighed the equitable considerations and chose not to dismiss Van Cauwenberghe's appeals on the basis of the disentitlement doctrine. (*Van Cauwenberghe, supra*, 934 F.2d at p. 1055.) The court considered Van Cauwenberghe's noncompliance rather minimal: He left without permission, but not in order to avoid satisfying obligations or to otherwise flout the processes of the law. (*Ibid.*) Moreover, the court of appeals noted, months prior to Van Cauwenberghe's departure the federal district court had made an express finding that no further probationary purpose would be served by requiring Van Cauwenberghe to remain in the United States, and this determination had caused the court of appeals to instruct the district court to consider modifying the terms of probation. Although he should not have left the country without permission, the court of appeals concluded that under the totality of the circumstances, dismissal was not warranted. (*Ibid.*)

The circumstances here differ significantly. Crucially, Van Cauwenberghe had been formally sentenced; Polanski has not. The trial court concluded that no probationary purpose was served by requiring Van Cauwenberghe to remain in the country; no decision has ever been made by a court that no purpose would be served by requiring Polanski to remain in the country. Van Cauwenberghe did everything his formal sentence required him to do, except that he left the country a bit ahead of the approval to depart; according to his allegations, Polanski did what the court allegedly told him to do to avoid further detention, then left the country before ever undergoing a

sentencing hearing.[28] While *Van Cauwenberghe, supra*, 934 F.2d 1048, shows that an appellate court, in its discretion, may conclude that a person's conduct does not merit disentitlement when it balances the equities, even when that person left the country and has an outstanding bench warrant, the Ninth Circuit's discretionary decision not to disentitle Van Cauwenberghe on appeal (which, incidentally, corresponds to this court's decision not to disentitle Polanski from seeking relief in this court) does not establish any abuse of discretion by the trial court when it weighed and balanced the totality of the circumstances in this matter.

*Doe v. Superior Court (Polanski), supra*, 222 Cal.App.3d 1406, concerned the civil action filed by Geimer against Polanski based on the events that gave rise to the criminal prosecution here. In that action, the trial court denied Geimer's request that the court strike Polanski's answer and enter a default against him. (*Id.* at p. 1408.) The Court of Appeal, in a divided decision, held that the disentitlement doctrine did not apply to the civil action, but not because it found that Polanski was not a fugitive or that his behavior did not amount to unclean hands. (*Id.* at pp. 1409–1411.) In fact, the majority described Polanski's flight as a "reprehensible, irresponsible, and unlawful absence from this country." (*Id.* at p. 1410.) Instead, the Court of Appeal ruled that because Polanski neither initiated the proceeding nor sought affirmative relief, to disentitle him from mounting a defense in a civil action because of his fugitive status would violate the due process clause of the Fourteenth Amendment to the United States Constitution. (222 Cal.App.3d at pp. 1409–1411.)

It is evident from the text of the *Doe v. Superior Court (Polanski)* decision that the Court of Appeal neither hinted nor ruled that Polanski should not be subject to the fugitive disentitlement doctrine where appropriate, and the court also emphasized that there was no relation between the civil action and

---

[28] Considering what could have happened at the sentencing hearing brings up another problem in determining on this record what commitment Judge Rittenband allegedly made to Polanski. Dalton alleged in 1978 that Judge Rittenband said "there would be no further incarceration" beyond the diagnostic stay at Chino. Clearly that would not rule out the imposition of probation at the sentencing hearing. In 2008, Dalton declared that Judge Rittenband said that the study would be the "complete punishment" under the plea as long as the report from Chino was favorable. This phrasing leaves open the possibility that Judge Rittenband could sentence Polanski to incarceration if the report was not favorable (although the report was in fact favorable), but would tend to indicate by its reference to "complete punishment" that Judge Rittenband had pledged himself to employ no other nonincarceration sentencing options, such as probation. Gunson's declaration sheds no light on whether Judge Rittenband made a commitment that ruled out probation, stating only that the diagnostic study would be Polanski's punishment. We do not impugn Dalton's veracity; we simply observe that smaller discrepancies as well as larger disputes make it impossible for this court to resolve the factual issues without an evidentiary hearing to find the facts of the alleged misconduct and punishment commitment.

Polanski's flight from the criminal action. (*Doe v. Superior Court* (*Polanski*), *supra*, 222 Cal.App.3d at p. 1410.) Polanski argues that it would be "similarly unconstitutional" to apply fugitive disentitlement here because he has been "forced out" of the country "and is simply trying to defend himself" against an "assault on his constitutional rights." Although Polanski claims he is only trying to defend himself, in fact he came to the court requesting affirmative relief: a dismissal of the criminal action. As we have discussed, Polanski has failed to avail himself of the many other options he has had to vindicate his constitutional rights, and he retains the ability to seek that vindication today. *Doe v. Superior Court* (*Polanski*) does not demonstrate any abuse of discretion here.

### 4. Conclusion

 While we agree with Polanski's contention that the gravity and constitutional aspects of his allegations matter greatly in this analysis and that when "a fugitive defendant seeks to vindicate a right vouchsafed by the United States Constitution, the Court should give weight to this factor in determining how to exercise its discretion" (*Veliotis, supra*, 586 F.Supp. at p. 1515), the responsibility of a court considering whether to apply the disentitlement doctrine remains to balance the many equitable concerns and to reach a decision based on the totality of the circumstances. (*Van Cauwenberghe, supra*, 934 F.2d at pp. 1054–1055.) Here, the seriousness of the misconduct that Polanski alleges played a role in his decision to flee clearly weighs against disentitlement, but the traditional justifications for the doctrine, Polanski's refusal to accept relief offered in the past, and the fact that he has always had legitimate alternatives to flight all weigh in favor of applying disentitlement here and support the trial court's ruling. Considering the totality of circumstances in reviewing the trial court's ruling on disentitlement, Polanski has not established that the trial court's decision fell outside the bounds of reason under the law and the facts here. (*Giordano, supra*, 42 Cal.4th at p. 663.) Whether or not we would have reached the same conclusion if we had been in the position of the trial court, we cannot say that the trial court's decision was so irrational or arbitrary that no reasonable person could agree with it, nor may we substitute our judgment for that of the trial court. (See, e.g., *Carmony, supra*, 33 Cal.4th at p. 377.)

### V. Writ Relief Is Not Warranted Here

Polanski urges this court to override the trial court's exercise of discretion and compel it to dismiss the prosecution. We decline to do so for several reasons.

In the first instance, this court lacks a sufficient factual foundation to grant relief. No factual findings have ever been made as to the allegations of

misconduct in this case, and as an appellate tribunal we are not equipped to make the factual findings that would be necessary for us to determine whether relief was warranted. What we have before us at this time is a set of declarations of judicial misconduct; a series of out-of-court statements in filmed interviews concerning judicial misconduct; and Wells's interview detailing what appears to be his own unethical conduct. Polanski asserts that the misconduct he has alleged is "undisputed," but the record and briefing submitted to this court reveal that there are in fact disputes as to the underlying facts. Judge Rittenband contradicted some of these statements in 1978 in his verified answer to Polanski's disqualification papers, and Polanski's communications with this court indicate that Wells may have recanted an unspecified number of his statements made in his film interview. Without dismissing or diminishing the allegations made here, at this point they remain allegations, and we lack a factual foundation that would permit us to offer the immediate dismissal relief that Polanski seeks. We cannot exercise our discretion on the basis of facts that no court has found.

Moreover, even if we were to accept all of Polanski's misconduct allegations as if they were supported by factual findings and admissible evidence, it is not at all clear to us that the relief Polanski seeks from this court is the proper relief for the misconduct that he has alleged. Polanski has claimed that all he is seeking is that we recognize that misconduct occurred and "provide him with the relief that he should have been given upon his release from prison over 30 years ago—conclusion of this prosecution without further threat of punishment" but the relief that he requests goes far beyond asking the courts to honor Judge Rittenband's alleged 1977 commitment that the diagnostic study would constitute Polanski's full punishment for unlawful sexual assault, presumably by a formal sentence to time served. Instead, Polanski seeks a complete dismissal of the criminal prosecution against him under section 1385, and he asks us to compel that result by means of writ of mandate. The effect of such a dismissal would be not only to bar any further prosecution or punishment for the crime, but also to entirely erase Polanski's plea to unlawful sexual conduct. He would "stand as if [he] had never been prosecuted" for the crime. (*People v. Simpson* (1944) 66 Cal.App.2d 319, 329 [152 P.2d 339]; see also *Barro, supra,* 93 Cal.App.4th at p. 67; *People v. Superior Court (Flores), supra,* 214 Cal.App.3d at p. 136 *(Flores).*)

Nothing in the record suggests that this is an appropriate result. Polanski has not alleged any misconduct with respect to the plea itself or at any point in the proceedings prior to the consideration of sentencing,[29] and therefore has not established any reason for this court to nullify the criminal

---

[29] There is one exception: Dalton alleged in the 1978 statement of disqualification for cause, inter alia, that Judge Rittenband had made statements about the case that appeared in a June 1977 issue of People magazine, two months before the plea was taken. Polanski, however, has

proceeding altogether. "While irresponsible or overzealous conduct by government agents is not to be condoned, in the case of challenged conduct which occurred only *after* a plea of guilty and neither coerced nor induced that plea, it is not immediately apparent how there could have been prejudice to a defendant which would justify withdrawal of the plea or dismissal." (*People v. Shaw* (1989) 210 Cal.App.3d 859, 865 [258 Cal.Rptr. 693] (*Shaw*).) In the cases on which Polanski relies to support his request for outright dismissal, *Boulas v. Superior Court* (1986) 188 Cal.App.3d 422 [233 Cal.Rptr. 487] (*Boulas*) and *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252 [36 Cal.Rptr.2d 210] (*Morrow*), the prosecutorial misconduct occurred before trial, impacted the integrity of the entire criminal proceeding, and could not be adequately remedied by any order short of dismissal.[30] Here, in contrast, except for one media statement in June 1977 all the malfeasance is alleged to have occurred postplea, and therefore there appears to be no basis for this court to conclude that the process by which the determination of Polanski's guilt was made was compromised in any way. Polanski, in short, has not shown that this court, on this record, should overturn his apparently untainted conviction for unlawful sexual assault because of misconduct occurring after he pleaded guilty to that offense.

■ Furthermore, Polanski seeks a writ of mandate, but a writ of mandate is only proper when the petitioner has no plain, speedy, and adequate remedy in the ordinary course of law. (Code Civ. Proc., § 1086.) Here, Polanski has not demonstrated that he is without such a remedy in the

---

not claimed that the proceedings leading up to and including the plea were tainted by misconduct, and his counsel stated at oral argument that all the misconduct at issue occurred after the plea was taken.

[30] In *Boulas, supra,* 188 Cal.App.3d at pages 426 through 429, a sheriff's deputy told a defendant, outside the presence of his counsel, that if he wanted to reach a plea bargain with the prosecutor he must discharge his attorney and retain an attorney acceptable to the district attorney. The trial court conducted an evidentiary hearing and found that the deputy had deliberately set out to cause the defendant to change counsel. (*Id.* at p. 429.) The court declined, however, to dismiss the charges. (*Ibid.*) The Court of Appeal compelled the trial court to dismiss the charges because the authorities had "effectively short-circuited Boulas's right to be assisted by counsel at a critical stage of the proceedings," "denied Boulas the right to have his counsel attempt to obtain a negotiated disposition," and "caused irremediable harm to Boulas's relationship with his attorney." (*Id.* at p. 433.) No remedy less than a dismissal could redress a violation of this magnitude. (*Id.* at p. 434.)

In *Morrow, supra,* 30 Cal.App.4th at page 1255, on the day trial was supposed to begin, the prosecutor sent her investigator to eavesdrop on conversations between the defendant and his counsel while they discussed the prosecutor's request that the defendant either plead guilty or waive time and accept a continuance. The trial court conducted an evidentiary hearing and found that eavesdropping had occurred and that confidential matters were discussed. (*Id.* at pp. 1257–1258.) The Court of Appeal ordered the trial court to set aside its order denying the petitioner's motion to dismiss, because only per se dismissal would sufficiently remedy the obvious harm and threat of demonstrable prejudice arising from the outrageous eavesdropping on the defendant's discussion of confidential matters with counsel. (*Id.* at p. 1263 & fn. 4.)

ordinary course of law. Polanski asked the trial court to apply section 1385 to conduct a hearing on his very serious allegations of misconduct that implicate due process in his criminal matter. Having no legal standing to make a motion under the express terms of section 1385, Polanski necessarily had to request the court to grant that hearing on its own motion, and ultimately the court declined to exercise its discretion to grant that evidentiary hearing because of Polanski's fugitive status. But this does not mean that Polanski has no other tools at his disposal to obtain the evidentiary hearing that he seeks and to make a record of, and obtain factual findings on, his evidence of judicial and prosecutorial misconduct.

Without returning to the United States or dropping his battle against extradition, Polanski may, through counsel, request that the trial court conduct the never-yet-held sentencing hearing in absentia pursuant to section 1193. If the trial court approves this request, then Polanski, through his counsel, will be able to obtain the evidentiary hearing that is so urgently required to establish the facts of what occurred in 1977 and 1978. The trial judge now presiding over the matter, Judge Espinoza, has already indicated that at a sentencing hearing Polanski would be able to fully litigate the allegations of misconduct and a prior pledge by Judge Rittenband as to Polanski's punishment. At the same hearing at which Judge Espinoza ruled that he would not entertain Polanski's section 1385 request, he also stated, "[H]aving reviewed all of the evidence in this case, notwithstanding the People's assertion that the misconduct that occurred is still in dispute, there was substantial, it seems to me, misconduct that occurred during the pendency of the case which will be among the many factors that would be considered by me and any other court that would sentence Mr. Polanski. He had a plea agreement[31] with Judge Rittenband. Unfortunately, Judge Rittenband is long since deceased, but the terms and conditions of that plea agreement are well known." While Judge Espinoza has expressed the view that Polanski is required by section 977 and the bench warrant to be present at any proceeding regarding his case, on this record it does not appear that he has ever been asked to release Polanski from that obligation, as he is authorized to do by section 1193. Because Polanski possesses a means to seek an evidentiary hearing on his allegations of prosecutorial and judicial misconduct, he has not demonstrated that he is without any remedy in the ordinary course of the law.[32]

---

[31] The term "plea agreement" to describe what actually appears to have been a postplea sentence agreement is a misnomer. First, by all accounts, the plea was taken without any negotiations or promises as to punishment and was an open plea. Second, according to the statements of both Dalton and Gunson, Gunson opposed the use of the diagnostic study as punishment.

[32] Should Polanski secure sentencing in absentia, we anticipate that any appeal subsequently taken while Polanski remains out of the country would be met with a request by respondent

## VI. *Disentitlement Does Not Prevent Relief*

As we discussed *ante* in part IV.B. of the Discussion, the disentitlement doctrine does not bar relief when a matter presents systemic issues and interests of higher importance than the values that would be advanced by disentitling a litigant because of his or her flight. Polanski argues that this is one of those cases: Only if this court compels the trial court to grant relief will the grave systemic issues he has raised be addressed. We disagree. A ruling that the trial court did not abuse its discretion when it declined to consider the merits of Polanski's request for a dismissal because of the disentitlement doctrine does not prevent the thorough airing of the serious allegations of injustice presented by this case. Polanski, the trial court, and the People all have the ability to ensure that this matter is resolved and that Polanski's allegations receive the court hearing that they deserve.

### A. *Polanski*

As we have already discussed, even without appearing in California courts Polanski may request to be sentenced in absentia. (§ 1193.) While the trial court would have to consent to this request, if it agreed, this would resolve the disentitlement problem that Polanski has encountered in the trial court and would afford him the evidentiary hearing that he so urgently seeks to support his allegations of misconduct. Judge Espinoza has already indicated on the record his opinion that the misconduct alleged by Polanski and the issue of the original trial court's sentencing commitment are relevant to and may be explored at a sentencing hearing. Polanski, therefore, still holds in his hands the potential means to hold the trial court to the commitment it allegedly made to him in 1977. As we have expressed elsewhere in this opinion, if Polanski presents admissible evidence leading the trial court to conclude that Judge Rittenband committed to the diagnostic study as Polanski's entire punishment, it is difficult to imagine that the trial court would not honor that commitment today.

Alternatively, or if a request for sentencing in absentia is denied, Polanski could return to California. As we have discussed *ante* in part IV.D.2.d., returning to the jurisdiction would permit Polanski to obtain the evidentiary hearing he seeks through a section 1385 request or at a sentencing hearing.

---

that this court then apply the disentitlement doctrine. Polanski, however, by then would have had the opportunity to establish a record by admissible evidence of the misdeeds he has alleged by Judge Rittenband and Wells, and to the extent that he had proven such misconduct in violation of his constitutional rights, these facts would properly be considered in the balance of equities required by the disentitlement doctrine. (See *Veliotis, supra*, 586 F.Supp. at p. 1515 ["where a fugitive defendant seeks to vindicate a right vouchsafed by the United States Constitution, the Court should give weight to this factor in determining how to exercise its discretion"].)

Upon a return to custody, Polanski would also be able to seek relief by means of petition for habeas corpus. Whatever avenues he may pursue, Polanski's return would enable him to present admissible evidence of judicial and prosecutorial misconduct and to finally conclude the criminal proceedings that have languished these many years.

## B. *The Trial Court*

The trial court's justified refusal to consider Polanski's request that it consider dismissing the prosecution on the basis that Polanski was not entitled to seek relief while defying the court's authority does not preclude the court from considering whether to offer relief—at the trial court's own instance in the furtherance of justice—based on the overarching systemic issues here of ensuring that the court system operates with integrity and responds appropriately to judicial and prosecutorial misconduct when it has occurred. The trial court is fully empowered, upon examining the evidence in this matter, to order an evidentiary hearing on whether to dismiss the prosecution in furtherance of justice. Such a hearing would permit the trial court to make factual findings as to the events in 1977 and 1978 and to dismiss the prosecution in its entirety if the facts so warrant. (Compare *Boulas, supra*, 188 Cal.App.3d 422 and *Morrow, supra*, 30 Cal.App.4th 1252 with *Shaw, supra*, 210 Cal.App.3d at p. 865; see also *People v. Orin* (1975) 13 Cal.3d 937, 945–948 [120 Cal.Rptr. 65, 533 P.2d 193] [delineating boundaries of the judicial power to dismiss proceedings in the interest of justice].) In this scenario, the trial court could consider the larger question of whether the justice system was compromised by the actions of the judge and a prosecutor not assigned to the case; the balance of the equities, without the weight of the request of a fugitive, could very well be different.

Should the trial court conclude that justice does not warrant outright dismissal of the prosecution with its concomitant elimination of Polanski's guilty plea (see, e.g., *Shaw, supra*, 210 Cal.App.3d at p. 865), another option for the trial court—on a finding that, reasonable efforts having been made to procure Polanski's presence, it would be in the interests of justice to do so (§ 1193, subd. (a))—would be to set a sentencing hearing for the purpose of taking evidence on the events of 1977 and 1978. If, after taking evidence, the trial court finds that Polanski's allegations are true and that the original trial judge agreed that the prison stay for the diagnostic study would constitute Polanski's entire punishment, a condition Polanski fulfilled, the trial court could find that justice requires that the trial court's commitment be honored and that Polanski should be sentenced to time served. Of course, sentencing would be complicated by the fact that the sentencing arrangement the trial court is said to have originally made was an illegitimate use of the provision for diagnostic studies: Section 1203.03, subdivision (f) provides that the

diagnostic facilities made available by the statute "shall only be used for the purposes designated and not in lieu of sentences to local facilities." But if the trial court concludes that justice requires honoring a commitment to serving only the amount of time required to perform the diagnostic study, then whether the ultimate sentence is reached by giving credit for time served during the diagnostic study pursuant to section 1203.03, subdivision (g) or whether another method of sentencing would be devised to ensure that Polanski served no future time in prison (such as Judge Fidler's alleged offer of a sentence of probation and immediate termination of probation), we are confident that the trial court could fashion a legal sentence that results in no further incarceration for Polanski.

Polanski has also suggested other alternatives to dismissal that might be appropriate here depending upon the court's ultimate factual findings, such as "specific enforcement of the sentence agreement, monetary sanctions imposed on the District Attorney's Office, or the appointment of special counsel to explore the misconduct of the District Attorney's office." As the trial court may use its inherent power to fashion "a remedy for deprivation of a constitutional right to suit the needs of the case" (*Flores, supra,* 214 Cal.App.3d at p. 144), the court may consider any suitable options.

### C. *The People*

 We are disturbed by the district attorney's refusal in the briefing submitted to this court to address or consider what appears to be an admission by a former member of the district attorney's office that he: engaged in highly improper ex parte communications with a judge about a pending matter; recommended the misuse of a sentencing tool as a punishment; deliberately provoked the judge against a defendant based on a newspaper photograph and no further information; and pursued a personal agenda against a defendant. Such profoundly unethical conduct, if proven to be true, strikes at the heart of the prosecutor's role as a guardian of systemic integrity. "In all [a prosecutor's] activities, his [or her] duties are conditioned by the fact that he [or she] 'is the representative not of any ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . .' [Citations.]" (*People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 266 [137 Cal.Rptr. 476, 561 P.2d 1164], superseded on other grounds by statute as stated in *People v. Conner* (1983) 34 Cal.3d 141, 147 [193 Cal.Rptr. 148, 666 P.2d 5]; see also *People v. Dehle* (2008) 166 Cal.App.4th 1380, 1388 [83 Cal.Rptr.3d 461] [it is appropriate for a prosecutor to want to bring a defendant to justice with respect to the charged crime, but a prosecutor is not disinterested if he or she has an axe to grind against the defendant].)

Although the district attorney's office dismisses the allegations concerning the conduct of former Deputy District Attorney Wells with the assertions that "[i]t is unknown at this time whether statements made during a heavily edited documentary reflect actual circumstances, opinions, or exaggerated braggadocio" and that Polanski is not entitled to a hearing on the merits until he returns, the district attorney's office has an interest in ascertaining whether, in fact, one of its former members committed unethical acts interfering with a criminal case. The prosecutor's responsibility to ensure that justice is done (*People v. Conner, supra*, 34 Cal.3d at p. 148) is not extinguished by a litigant's bad behavior: While Polanski's unclean hands may disentitle him from requesting relief, the need remains to investigate and take appropriate curative action in response to Wells's admissions that he engaged in prosecutorial misconduct in the Polanski matter.

Similarly, although Judge Rittenband's alleged transgressions cannot be attributed to the district attorney's office, former Deputy District Attorney Gunson has declared under penalty of perjury that the trial court engaged in misconduct. "Prosecutors play a dual role in the criminal justice system; they are advocates, but they are also administrators of justice. [Citation.] ' "[I]t is their sworn duty to see that the defendant has a fair and impartial trial . . . ." ' [Citation.]" (*People v. Bryden* (1998) 63 Cal.App.4th 159, 182 [73 Cal.Rptr.2d 554].) This role as an administrator of justice should prompt the district attorney's office to internally investigate whether the allegations of judicial misconduct are substantiated and whether Polanski was subjected to unethical and unjust proceedings.

We cannot know what a thorough, neutral investigation may reveal.[33] However, if the district attorney finds that the allegations of prosecutorial and/or judicial misconduct advanced by Polanski are substantiated, we expect the district attorney's office both to consider whether to refer former Deputy District Attorney Wells to the State Bar of California for disciplinary proceedings and to seek condign remedies for the misconduct. Should the misconduct be found by the district attorney's office to have tainted the proceedings against Polanski to the point that justice would be furthered by a dismissal of the entire prosecution, the district attorney's office is empowered to and should apply to the trial court for a dismissal of the action under section 1385. Alternatively, if the district attorney's office finds that misconduct occurred after the taking of the plea and with regard to the sentence only, the district attorney's office could request that the court set a sentencing hearing in absentia and that Polanski be sentenced only to time served.

---

[33] The investigation of the alleged misconduct should occur immediately, regardless of Polanski's custody status, because further delay threatens to frustrate the determination of the veracity of Polanski's allegations: The original trial judge has died; the two prosecutors involved in the matter have retired; and the memories of witnesses may lose precision over intervening decades. Moreover, the absence of finality here continues to injure Geimer.

## VII. *Polanski's Transfer and Disqualification Requests*

In the event that this court does not grant full relief or compel the trial court to do so, Polanski asks that the matter be remanded for an evidentiary hearing in another county and that the district attorney's office be disqualified from representing the People in any future proceeding in the matter.

### A. *Arguments Concerning the Los Angeles Superior Court*

Although Polanski offers five arguments for transfer of the cause to another county, he has not demonstrated that the entire Los Angeles County Superior Court is unable or unwilling to render justice in this matter. First, he argues that Judge Rittenband refused to conduct a sentencing hearing before deciding to impose incarceration on Polanski beyond the time he had spent in custody for the diagnostic study, thus denying Polanski due process and the opportunity to make a record of the court's misconduct. Second, he observes that Judge Rittenband recused himself when Dalton sought his disqualification, thereby precluding an evidentiary hearing where Polanski's claims of misconduct would have been supported by testimony. As part of this argument, Polanski also alleges that the district attorney's office knowingly filed Judge Rittenband's false response to these allegations.

These first two arguments concern the alleged actions 31 years ago of a now deceased trial judge. Leaving aside the problem we have already discussed that these facts are disputed and we are not able to resolve the factual disputes in this court, Polanski has offered no basis in fact or law to support his implicit argument that we should consider the entire current county bench complicit in the in-chambers misconduct of a judge who left the bench two decades ago and is now deceased. Moreover, the allegation that the district attorney's office filed a false declaration is irrelevant to the question of transfer of the matter away from the Los Angeles County Superior Court.

Third, Polanski argues that in 30 years, the district attorney's office has never once attempted to secure his extradition, and although he does not specifically claim that this alleged dereliction was designed to prevent an evidentiary hearing, he argues that "[i]f it had [sought extradition], there would have been a hearing regarding the misconduct in this case." Fourth, he contends that the district attorney's office has tried to avoid discovery that he has attempted to initiate since filing his request for a dismissal in the furtherance of justice. These arguments offer no basis for transferring the matter away from the trial court, as they concern only the conduct of the district attorney's office, and Polanski has offered no explanation or argument for why the actions of that office should be imputed to the trial court.

Finally, Polanski argues that at the hearing on the request for a dismissal, Judge Espinoza and the district attorney's office "avoided an evidentiary hearing" by applying the fugitive disentitlement doctrine, thereby "effectively condoning the misconduct." This argument seems to posit that any court that rules against Polanski must be using whatever grounds upon which it relies as an attempt to frustrate an inquiry into long-ago misconduct. Polanski offers no factual basis whatsoever for his unsupported argument that the trial court now is engaged in a coverup of the alleged 1977 and 1978 misconduct. Our holding that the trial court did not abuse its discretion in applying the disentitlement doctrine would seem to dispose of any idea that the trial court set out to defeat the ends of justice here. Moreover, although he ruled that Polanski had forfeited by his then ongoing 30-year stint as a fugitive any authority he would otherwise have had to ask the court, on its own motion, to dismiss the charges against him, Judge Espinoza stated that it appeared to him that there had been misconduct, that he would consider that misconduct if Polanski returned to the jurisdiction, and that the motion was not only denied without prejudice, but it also would not take effect for more than two months[34] so that Polanski could return to the United States if he desired a hearing on his allegations. While Polanski did not obtain the relief he wanted on his terms, these hardly seem the actions of a court that is aiming to preclude Polanski's contentions from ever being addressed on their merits.

Although it is not mentioned in this portion of the petition, we assume that Polanski also believes that transfer is supported by his contention, presented elsewhere in the petition for writ of mandate, that Judge Espinoza's statement that, if Polanski returned to the jurisdiction, he or another judge would "sentence" him means that the judge has prejudged the question of dismissal and would not dismiss the charges against Polanski even if he returned to California. This "effective[] indicat[ion]" that Polanski purports to derive from the court's reference to the procedural posture of the case[35] is directly belied by the trial court's written order agreeing to "consider the merits of the motion" if Polanski submitted to the jurisdiction of the court within the duration of the stay granted by the court, as well as by the court's denial of the motion without prejudice at the conclusion of the stay.

---

[34] The court's written order, dated February 17, 2009, provided for a 30-day stay, but at the hearing on the matter, the court orally stayed the order until May 7, 2009.

[35] Polanski has never had a formal sentencing hearing. His own counsel has observed that Polanski, having pleaded guilty in August 1977, was next scheduled to be sentenced: Dalton declared that September 19, 1977, was the date set for the "Probation Hearing and Sentencing." We know from the record of that hearing that the court ordered Polanski to undergo the diagnostic study and then to return to court "for further proceedings." In the absence of the imposition of sentence at the September 19, 1977 hearing—and whatever agreements Judge Rittenband may have made in secret, on the record he did not impose sentence on Polanski—procedurally, the next hearing for Polanski remained, and remains to this day, a sentencing hearing.

In sum, Polanski has not established any basis for this court to disqualify the trial court and the entire county bench from proceeding over this matter.

## B. *Arguments Concerning the District Attorney's Office*

Although in his petition for writ of mandate Polanski sets forth a series of claims concerning the conduct of the district attorney's office in the context of his argument that the matter should be transferred to a different county, his argument dedicated to the request for disqualification of the district attorney's office from the matter does not include any of those allegations. We address them here, and then proceed to the arguments he directs against the present district attorney personally.

Polanski asserts that the district attorney's office knowingly filed Judge Rittenband's false response to Dalton's statement of disqualification for cause. This is contradicted by the very page in the record on which Polanski relies as support for his assertion. The cover of Judge Rittenband's answer to the statement of disqualification bears the names of John H. Larson, county counsel, and John P. Farrell, deputy county counsel. The Office of the Los Angeles County Counsel, established in 1913 pursuant to the Los Angeles County Charter, is distinct from the Los Angeles Office of the District Attorney. (*Board of Supervisors v. Simpson* (1951) 36 Cal.2d 671, 673–674 [227 P.2d 14] [noting that L.A. County Counsel has been appointed pursuant to county charter since 1913 and "does not have the powers and duties of a district attorney except as they are given by section 22 of the charter"], superseded by statute on other grounds as stated in *People v. Bhakta* (2006) 135 Cal.App.4th 631, 639–640 [37 Cal.Rptr.3d 652].)

Next, Polanski argues that in 30 years, the district attorney's office has never once attempted to secure his extradition, and intimates that this lack of effort indicates disinterest in a hearing regarding the misconduct alleged in this case. The district attorney's office contests this unsupported statement of fact, and of course, Polanski's subsequent apprehension proves conclusively that the district attorney's office tried at least once to secure his extradition. Moreover, even if it were not both unsupported and in at least one respect demonstrably false, the argument proves too much. If we should consider the district attorney's office to have frustrated the urgent need for an evidentiary hearing by failing to catch Polanski after he fled, how can we not hold the person who fled and supposedly should have been caught by the district attorney's office at least equally responsible for frustrating that urgent need?

Polanski's next two arguments both allege that if the district attorney's office opposes Polanski's requests, it must be trying to frustrate the pursuit of truth. First, Polanski contends that the district attorney's office has tried to

avoid discovery that he has attempted to initiate since filing his request for a dismissal in the furtherance of justice because it has opposed Polanski's ex parte requests for subpoenas and the disclosure of any communications between the district attorney's office and the trial court. This is merely an invitation to wade into a dispute between Polanski and the district attorney's office and to make factual findings that this court is not equipped to make. Second, Polanski argues that the district attorney's office avoided an evidentiary hearing by alleging that Polanski should be subject to the fugitive disentitlement doctrine. In light of the fact that the trial court's ruling on the section 1385 request was within its discretion, the People's espousal of that position would not seem to constitute misconduct; and Polanski has offered no evidence that the People had any motive beyond seeking to dissuade the trial court from dismissing the charges when they advocated the application of the fugitive disentitlement doctrine. Polanski's arguments with respect to the prosecutor's office do not provide a basis for disqualifying the entire district attorney's office.

Polanski, however, also claims that the district attorney's office should be disqualified from further representing the People of the State of California in this matter because of a statement District Attorney Steve Cooley is alleged to have made in an interview printed in the Criminal Law Journal. District Attorney Cooley is quoted as saying that the legislative initiative process in California "has been whored beyond belief," and that the Victims' Bill of Rights Act of 2008: Marsy's Law, also known as Proposition 9, may have unintended consequences, citing Geimer's efforts to cause the conclusion of criminal proceedings against Polanski without further punishment. District Attorney Cooley allegedly said that Geimer's ability to seek dismissal of the charges against a man who pleaded guilty to having unlawful sexual intercourse with her when she was 13 years old "shows you how the special role of being a victim can, in a sense, be corrupted by a defendant who happens to have money. There have been suggestions that there was a civil settlement way back when with this victim, and there are currently relationships going on with this victim and Mr. Polanski and her lawyers. They were documented just yesterday in the *L.A. Times* [January 13, 2009]. When you look at her picture, the victim—who, by the way, we didn't name in any of our moving papers—comes out and names herself. But the picture that is submitted is her standing in front of a premiere of some Polanski-related film. So the system's already being corrupted by the so-called Victim's Bill of Rights."

Polanski argues that these statements are false and violate both rule 5-120 of the Rules of Professional Conduct and section 6068, subdivision (f) of the Business and Professions Code. Moreover, he declares, without any explanation or support, that they were "undoubtedly intended to intimidate Mr. Polanski and end any prospect of a voluntary return." Polanski characterizes this as "only one of multiple instances of ethical and statutory violations

committed by the District Attorney's Office during this case," but does not further describe any alleged violations. Polanski notes that section 1424 permits the recusal of a district attorney based on a conflict of interest that would render it unlikely that the defendant would receive a fair trial. What Polanski does not say is that section 1424 sets out a very clear process for seeking to disqualify a district attorney: The notice of a motion to disqualify a district attorney is to be served on the district attorney and the Attorney General at least 10 court days before the motion is heard. (§ 1424, subd. (a).) The notice of motion must contain a statement of the facts setting forth the grounds for the claimed disqualification and the legal authorities relied upon by the moving party and shall be supported by affidavits of witnesses who are competent to testify to the facts set forth in the affidavit. (§ 1424, subd. (a).) The district attorney or the Attorney General, or both, may file affidavits in opposition to the motion and may appear at the hearing on the motion and may file with the court hearing the motion a written opinion on the disqualification issue. (§ 1424, subd. (a).) The judge reviews the affidavits and determines whether an evidentiary hearing is necessary. (§ 1424, subd. (a).)

██ Defendants "bear the burden of demonstrating a genuine conflict" by a motion for recusal of the prosecutor and/or the prosecutor's office. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 709 [76 Cal.Rptr.3d 250, 182 P.3d 579].) A motion to recuse "is directed to the sound discretion of the trial court, and its decision to grant or deny the motion is reviewed only for an abuse of discretion." (*Id.* at p. 711.) Here, on the record provided by Polanski, we have no motion to recuse, no findings of fact by the trial court, and no rulings of law by the trial court—merely a demand that we disqualify an entire office based on the appearance in print of a statement attributed to District Attorney Cooley. This is completely insufficient to support the disqualification of the entire district attorney's office from participating in this case. "Recusal of an entire district attorney's office is an extreme step. The threshold necessary for recusing an entire office is higher than that for an individual prosecutor. [Citation.]" (*People v. Cannedy* (2009) 176 Cal.App.4th 1474, 1481 [98 Cal.Rptr.3d 596].) "Thus, 'the entire prosecutorial office of the district attorney should not be recused in the absence of some substantial reason related to the proper administration of criminal justice.' [Citations.]" (*Id.* at p. 1482.)

VIII. *Conclusion*

██ Although there is no basis for extraordinary relief here—Polanski retains remedies in the ordinary course of the law, and the trial court did not abuse its discretion in relying on the disentitlement doctrine to deny Polanski

the opportunity to seek relief—we remain deeply concerned that these allegations of misconduct have not been addressed by a court equipped to take evidence and make factual determinations as to the events in 1977 and 1978. Fundamental fairness and justice in our criminal justice system are far more important than the conviction and sentence of any one individual. "[F]or my part I think it a less evil that some criminals should escape than that the government should play an ignoble part." (*Olmstead v. United States* (1928) 277 U.S. 438, 470 [72 L.Ed. 944, 48 S.Ct. 564] (dis. opn. of Holmes, J.).)

Polanski's allegations urgently require full exploration and then, if indicated, curative action for the abuses alleged here. Time continues to pass, and the delay in addressing this matter has already removed one participant from the ranks of available witnesses for an evidentiary hearing on the judicial and prosecutorial misdeeds that have been alleged here. The passage of more time before this case's final resolution will further hamper the search for truth and the delivery of any appropriate relief, and it will also prolong the agony that the lack of finality in this matter continues to cause Samantha Geimer.[36] We exhort all participants in this extended drama to place the integrity of the criminal justice system above the desire to punish any one individual, whether for his offense or for his flight. As Justice Murphy wrote in dissent in *Eisler, supra*, 338 U.S. at pages 194 to 195, "Our country takes pride in requiring of its institutions the examination and correction of alleged injustice whenever it occurs. We should not permit an affront of this sort to distract us from the performance of our constitutional duties." We encourage all participating parties to do their utmost to ensure that this matter now draws to a close in a manner that fully addresses the issues of due process and fundamental fairness raised by the events of long ago.

---

[36] Under article I, section 28, subdivision (b)(9) of the California Constitution, crime victims are entitled to "a prompt and final conclusion of the case." The California Constitution also provides that "[v]ictims of crime are entitled to finality in their criminal cases," although the remainder of that provision makes clear that what is contemplated is freeing victims from the fear that the offender will not be sufficiently punished. (Cal. Const., art. I, § 28, subd. (a)(6) ["Lengthy appeals and other post-judgment proceedings that challenge criminal convictions, frequent and difficult parole hearings that threaten to release criminal offenders, and the ongoing threat that the sentences of criminal wrongdoers will be reduced, prolong the suffering of crime victims for many years after the crimes themselves have been perpetrated. This prolonged suffering of crime victims and their families must come to an end."].) Geimer has attested to the continuing trauma caused by the lack of finality here and the endless media interest in the case. Although Geimer blames the failure to conclude this case on judicial and prosecutorial corruption, Polanski's decision to flee rather than to avail himself of legal remedies for that alleged misconduct cannot be excluded as a significant, if not primary, cause of the failure to conclude the matter. Regardless of the blame, we remind Polanski, the district attorney's office, and the trial court that each has the power to pursue the long overdue resolution of this matter.

## DISPOSITION

The writ petition is denied.

Perluss, P. J., and Woods, J., concurred.