Filed 5/15/15  P. v. Quintanilla CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B258482 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA100177-01) |
| v. | |
| NELSON ORLANDO QUINTANILLA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County,

Craig Richman, Judge.  Affirmed.

Alex Green, under appointment by the Court of Appeal, for Defendant and

Appellant.

No appearance for Plaintiff and Respondent.

In August 1994, defendant and appellant Nelson Orlando Quintanilla pleaded no contest to possession of a controlled substance for sale. Twenty years later, Quintanilla filed a petition for a writ of error *coram nobis* and a motion to vacate his conviction "in furtherance of justice." The trial court held an evidentiary hearing and then denied Quintanilla's petition and motion. On appeal, Quintanilla's counsel filed a brief finding no arguable issues and asking the court independently to review the entire record under *People v. Wende* (1979) 25 Cal.3d 436. We have done so and find no error. We therefore affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Because Quintanilla waited twenty years to file his petition and motion, little remains of the court file in this case.[1] According to Quintanilla's moving papers in the trial court, the Los Angeles Police Department arrested him on August 16, 1994 for possession for sale of a controlled substance -- 28 wafers of rock cocaine found in a black plastic key box -- in violation of Health & Safety Code section 11351.5. On August 31, 1994, Quintanilla pleaded no contest to the charge. Apparently in accordance with Quintanilla's plea agreement with the People, the court placed him on probation and ordered him to serve 180 days in the county jail. Quintanilla was deported in September 1994 and the court issued a bench warrant for his arrest in April 1997. Twelve years later, in April 2009, Quintanilla was arrested on the warrant. He admitted the probation violation, and the court gave him credit for time served (21 actual days) and terminated probation. Federal authorities apparently took Quintanilla into custody on March 7, 2014.

On July 1, 2014, Quintanilla -- represented by counsel -- filed a pleading entitled "Notice of Motion and Petition for Writ of Error Coram Nobis or, in the Alternative, Motion To Vacate Conviction Pursuant to Penal Code [Section] 1385." Quintanilla

---

[1]     From the discussion at the hearing in the trial court, it appears counsel and the court had at least the reporter's transcript of the plea, the transcript of the preliminary hearing for Quintanilla's co-defendant, and a probation department report. None of these documents are included in the record on appeal.

asserted that he did not "possess any cocaine whatsoever" and that the police report was "simply a lie." Quintanilla contended that the LAPD later terminated the arresting officer for misconduct: beating a suspect severely in February 1998. Quintanilla also argued that his defense attorney was constitutionally ineffective because she did not ask him about his citizenship or immigration status and did not "provide any . . . meaningful consultation" about the immigration consequences of his plea.

On July 21 and 22, 2014, the trial court conducted an evidentiary hearing on Quintanilla's petition. Quintanilla did not appear at the hearing because he was in federal immigration custody. Quintanilla's counsel submitted a declaration by Quintanilla. Quintanilla stated in his declaration that, at the time of the plea, his public defender did not "ma[k]e [him] aware" "of the severe immigration consequences of [his] plea." Quintanilla said his attorney "never even asked if [he] was a United States citizen or what [his] immigration status was." The district attorney objected to the declaration because Quintanilla was not available for cross-examination.

Quintanilla's attorney subpoenaed the public defender who had represented him in 1994 -- Clarisse Hamblin -- to appear and testify at the hearing. Hamblin testified that she had no specific recollection of Quintanilla's case. In 1994, Hamblin had been a public defender for about five years. Hamblin said her practice in 1994 in advising a client charged with a crime like Quintanilla's was to explain "such a charge" would be "moral turpitude," and "there may be immigration consequences which may result in the deportation of that individual from the country." Hamblin testified it has always been the "practice in [the public defender's] office to advise clients of the immigration consequences of their pleas." Hamblin stated, "I always try to seek the best deal possible for my client. Especially, if immigration is an issue in the case. I will certainly advise my client that entering a plea that's been offered by the district attorney['s] office -- which I feel obligated to convey to the client at any time [the defendant is offered] a deal by the district attorney's office. I will advise that person what the consequences, what I believe the consequences could be to their immigration status in the United States, to their presence in the United States, i.e., that they could be deported

if they entered into the plea." Hamblin testified, "I think I would inquire into what the specific immigration status of the individual was, what the charges were and what potentially, what the potential consequences of entering a plea to those specific charges were. Yes, I would probe further . . . . " Hamblin said she knew what an "aggravated felony" was under federal law, that she "would have attempted to get the best possible deal for my client that was possible at that time," and that "of course" she knew about the nuances of immigration law. Hamblin testified that she "certainly" would have evaluated whether the evidence against her client was strong or weak and she would have considered counteroffers to different charges as well as possible motions.

Quintanilla's attorney submitted excerpts from the Rampart Area Corruption Incident Public Report, dated March 1, 2000. According to the report, Los Angeles Police Department Officer Brian Hewitt choked and beat an arrestee in February 1998. The department fired Hewitt after a board of rights hearing. Hewitt apparently was the officer who had arrested Quintanilla in this case in August 1994.

At the conclusion of testimony, Quintanilla's counsel contended the court should grant Quintanilla a writ of error *coram nobis* based on the finding that several years later Hewitt brutally beat an arrestee. Counsel argued that, at the time he entered his plea deal with the prosecution, Quintanilla did not know "that Officer Hewitt later was proven to be the thug that he was proven to be." Quintanilla's attorney also asked the court to vacate his conviction in the interest of justice under Penal Code section 1385 because his public defender was constitutionally ineffective and his deportation by federal authorities would leave his wife and his children bereft.

The district attorney opposed Quintanilla's request. She argued that Hewitt's partner, Officer Thornton, had testified at the co-defendant's preliminary hearing that he had seen Quintanilla drop an item on the street. According to the prosecutor, Thornton testified he then saw Hewitt pick up the item -- the key box -- and show it to him. So, argued the prosecutor, even if Hewitt were tainted there was another witness to Quintanilla's possession of the cocaine. The prosecutor also contended the court could not "dismiss" Quintanilla's case or vacate his conviction under section 1385 because the

4

case had long since ended. As for the equities, the prosecutor noted that Quintanilla had been deported soon after his conviction, had returned to the United States illegally, and had had a number of avenues open to him over the previous twenty years to move to withdraw his plea or challenge his conviction. He had not done so.

The trial court denied the petition and motion. The court, citing the reporter's transcript of the plea proceeding, noted the deputy district attorney who took Quintanilla's plea "clearly . . . advised [him] during the course of his plea of the immigration consequences of the plea."[2] The court stated Quintanilla "took advantage of what he believed to be an advantageous disposition, pre-preliminary hearing, knowing that the witnesses were available to come to court to testify and were actually in court available to testify." The court observed that Quintanilla was deported "within a month of the plea and had there been any surprise concerning the deportation it would have been raised at that point in time and was not." The court also noted the court file reflected a red flag of some sort indicating that the case might "fall within the Rampart scandal," and that Quintanilla did not raise any argument about Hewitt when he was arrested on the warrant in 2009 and granted a termination of his probation with credit for time served.

Quintanilla appealed. His court-appointed counsel submitted a brief asking this court independently to review the record under *People v. Wende, supra,* 25 Cal.3d 436. On March 19, 2015, the court received a letter from Quintanilla stating that his family needs him in the United States and that he has not suffered any convictions since 1994.

### *DISCUSSION*

We review the trial court's denial of Quintanilla's petition for a writ and motion to dismiss "in furtherance of justice" for abuse of discretion. (*People v. McElwee*

---

[2]    As the district attorney advised Quintanilla at the time of his plea of the immigration consequences, Quintanilla could not and did not move to vacate his plea under Penal Code section 1016.5. His attorney noted at the hearing that Quintanilla also did not qualify for *habeas* relief. (See *People v. Villa* (2009) 45 Cal.4th 1063, 1066 (*Villa*) [defendant "ineligible for relief by way of a writ of habeas corpus" because in federal custody, not in California custody as a result of his 20-year-old conviction].)

(2005) 128 Cal.App.4th 1348, 1352 [writ petition]; *Polanski v. Superior Court* (2009) 180 Cal.App.4th 507, 536 (*Polanski*) [motion under Penal Code section 1385].)

      1.     *The Trial Court Did Not Err in Denying Quintanilla's Petition for a Writ of Error Coram Nobis*

"The writ of error *coram nobis* is a nonstatutory, common law remedy whose origins trace back to an era in England in which appeals and new trial motions were unknown." (*People v. Kim* (2009) 45 Cal.4th 1078, 1091 (*Kim*).) "[T]he writ's purpose 'is to secure relief, where no other remedy exists, from a judgment rendered while there existed some fact which would have prevented its rendition if the trial court had known it and which, through no negligence or fault of the defendant, was not then known to the court.' " (*Kim, supra,* 45 Cal.4th at p. 1091, quoting *People v. Adamson* (1949) 34 Cal.2d 320, 326-327.)

The petitioner must meet several requirements.  First, he " 'must "show that some fact existed which, without any fault or negligence on his part, was not presented to the court at the trial on the merits, and which if presented would have prevented the rendition of the judgment." ' " (*Kim, supra,* 45 Cal.4th at p. 1093, quoting *People v. Shipman* (1965) 62 Cal.2d 226, 230 (*Shipman*).)  Second, he " 'must also show that the "newly discovered evidence . . . [does not go] to the merits of issues tried; issues of fact, once adjudicated, even though incorrectly, cannot be reopened except on motion for new trial." ' " (*Ibid.*)  " 'This second requirement applies even though the evidence in question is not discovered until after the time for moving for a new trial has elapsed or the motion has been denied.' " (*Ibid.*)  Third, he " ' "must show that the facts upon which he relies were not known to him and could not in the exercise of due diligence have been discovered by him at any time substantially earlier than the time of his motion for the writ. . . . " ' " (*Ibid.*)

A petitioner must also "show due diligence when seeking such extraordinary relief." (*Kim, supra,* 45 Cal.4th at p. 1096.)  " 'It is well settled that a showing of diligence is prerequisite to the availability of relief by motion for *coram nobis*.' " (*Id.,* at p. 1096, quoting *People v. Shorts* (1948) 32 Cal.2d 502, 512.)  The "burden falls to

defendant 'to explain and justify the delay.' " (*Kim, supra,* 45 Cal.4th at p. 1096, quoting *People v. Castaneda* (1995) 37 Cal.App.4th 1612, 1618.) "The diligence requirement is not some abstract technical obstacle placed randomly before litigants seeking relief, but instead reflects the balance between the state's interest in the finality of decided cases and its interest in providing a reasonable avenue of relief for those whose rights have allegedly been violated." (*Kim, supra,* 45 Cal.4th at p. 1097.)

In the trial court, Quintanilla argued the "fact" that existed and was not presented to the court at the time of his 1994 plea was "that Former Officer Hewitt was . . . an officer whose trustworthiness was utterly lacking . . . due to his propensity . . . to engage in egregious police misconduct against arrestees that he suspected of criminal behaviour [*sic*]." Quintanilla acknowledged that Hewitt's beating of a suspect did not take place until three and a half years after his arrest and no contest plea. But, he contended, had the prosecutor, defense counsel, and the court known in August 1994 that Hewitt would be removed for misconduct several years later, "it is virtually inconceivable that [Hewitt's] police report . . . would have been the basis" for Quintanilla's plea.

Even if Hewitt's character flaws existed in 1994 (though not manifested until 1998), and those flaws could be considered the requisite "fact" that would have prevented Quintanilla's conviction, Quintanilla has not shown due diligence. He asserted in the trial court that he did not learn of Hewitt's misconduct until his lawyer told him about it in 2014. But, as the trial court noted, Quintanilla was deported almost immediately after his August 1994 conviction. He returned to the United States *that same year.* Plainly, within weeks of his plea, Quintanilla learned of the immigration consequences (even if he somehow failed to hear what the prosecutor told him at the time of his plea). Yet he took no action to seek to withdraw his plea or challenge his conviction while the People still had an opportunity to go forward with their prosecution and bring Quintanilla to trial. The Rampart scandal received considerable press attention and the public report Quintanilla now cites was released on March 1, 2000, more than 14 years before he petitioned for *coram nobis.* On this record, Quintanilla has failed to show -- and cannot show -- that he could not have discovered the "facts"

7

about Hewitt " ' "in the exercise of due diligence . . . at any time substantially earlier than the time of his motion for the writ." ' " (*Kim, supra,* 45 Cal.4th at p. 1097, quoting *Shipman, supra,* 62 Cal.2d at p. 230.)

2. *The Trial Court Did Not Err in Denying Quintanilla's Motion To "Dismiss" his Conviction in Furtherance of Justice*

Quintanilla moved, in the alternative, to "vacate" his plea and "resulting conviction in this case, nunc pro tunc" under Penal Code section 1385. Quintanilla argued the "interests of justice" would be served by such an order, because he was "den[ied] . . . the right to effective representation as guaranteed by the 6th Amendment to the United States Constitution," Hewitt was later fired as a police officer, and Quintanilla's conviction (and, presumably, his deportation) would have a "devastating effect" on his children.

Penal Code section 1385 provides, in part, "The judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." " 'A defendant has no right to make a motion, and the trial court has no obligation to make a ruling, under section 1385.' " (*Polanski, supra,* 180 Cal.App.4th at p. 527, quoting *People v. Carmony* (2004) 33 Cal.4th 367, 375.) However, a defendant " 'does have the right to "invite the court to exercise its power [by, for example, striking a count of an accusatory pleading], and the court must consider evidence offered by the defendant in support of his assertion that the dismissal would be in furtherance of justice." ' " (*Id.* at p. 527.)

Quintanilla did not cite any case in the trial court for the proposition that a court may vacate a conviction under section 1385 long after the case has ended and probation has been terminated, nor have we been able to find one. (Compare *People v. Barraza* (1994) 30 Cal.App.4th 114, 121, fn. 8 [section 1385 "has never been held to authorize dismissal of an action after the imposition of sentence and rendition of judgment"] with *People v. Orabuena* (2004) 116 Cal.App.4th 84, 96-98 [court had authority to dismiss disqualifying misdemeanor under section 1385 to render defendant eligible for Proposition 36 drug treatment when court had suspended imposition of sentence and

8

defendant was still on probation].) Nor should Quintanilla be permitted to circumvent governing law limiting his procedural remedies for purported ineffective assistance of counsel by asking the court to exercise its authority under the general provisions of section 1385. (See *Villa, supra,* 45 Cal.4th 1063 [*habeas* not available to defendant whose counsel "misadvised" him about deportation, because defendant no longer in California custody]; *People v. Shokur* (2012) 205 Cal.App.4th 1398, 1401 [no "nonstatutory motion safety net" for defendant who claimed his public defender did not ask about his immigration status nor advise him conviction would result in removal].)

In any event, the trial court did not abuse its discretion in concluding that vacating Quintanilla's plea and conviction twenty years after the fact would not be in furtherance of justice. The lawyer who represented Quintanilla at the time of his plea testified that she was quite familiar with immigration law and that she routinely advised clients about the consequences of a plea. She tried to get the best offers she could for her clients, taking into account the potential immigration consequences. The prosecutor told Quintanilla at the time of his plea of the immigration consequences. Quintanilla was deported "within a month" of his plea. He returned within a few months, and continued to live in the United States for the next 20 years. As the trial court noted, once he was deported in September 1994, Quintanilla obviously knew his conviction would result -- indeed, had resulted -- in his removal from the United States. Yet he took no action to come to court to seek to withdraw his plea at a time when the People could have taken the case to trial -- while the prosecution still had its evidence (the cocaine) and witnesses. Nor did Quintanilla make any effort to comply with the terms of his probation. When he finally was apprehended on the warrant in 2009, Quintanilla admitted the probation violation and served only 21 days in jail, never raising any issue about immigration advisements or Hewitt's 1998 misconduct.

Finally, Quintanilla's wife and children will no doubt suffer from his absence. But the responsibility for that suffering must lie with Quintanilla, not the People or the court.

9

### *DISPOSITION*

We find Quintanilla's counsel on appeal has fully complied with his responsibilities, that no arguable issues exist, and that the court properly denied the writ petition and motion.  Accordingly, we affirm.

### *NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*

EGERTON, J.[*]

WE CONCUR:

EDMON, P. J.

KITCHING, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.